## Commonwealth *vs.* Agapito Lao.

Suffolk. October 2, 2007. - December 10, 2007.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Constitutional Law,* Assistance of counsel, Confrontation of witnesses. *Practice, Criminal,* Assistance of counsel, Confrontation of witnesses, New trial. *Evidence,* Hearsay, Spontaneous utterance.

Discussion of various categories and formulations of testimonial statements described in *Crawford* v. *Washington,* 541 U.S. 36 (2004), which, when admitted in evidence, violate a criminal defendant's right of confrontation guaranteed by the Sixth Amendment to the United States Constitution. [221-225]

In a murder case, a substantial miscarriage of justice warranting a new trial arose from the defendant's appellate counsel's failure to explore the issue of possible violations of the defendant's constitutional right to confront witnesses against him arising from the admission at trial of certain out-of-court statements pertaining to motive that likely would have been excluded from evidence as testimonial, including a recorded telephone call from the victim to 911 reporting the defendant's alleged attempt to run over the victim with his vehicle [225-226]; the victim's statements to a police officer after he arrived at her home in response to her 911 call [226]; and a witness's trial testimony recounting the victim's statements to the police officer [227], where the failure to raise the issue of the possible violation of the defendant's rights amounted to conduct falling measurably below that expected from an ordinary fallible lawyer, and it was uncertain whether the jury's verdict would have been the same absent the motive evidence, a significant part of the Commonwealth's case [227-228]; however, the victim's statements to her daughter that the defendant tried to run over her were not testimonial, as they were remarks to a relative rather than a police officer, and nothing suggested the victim had any reasonable expectation that those comments would be used later prosecutorially [226-227].

Indictment found and returned in the Superior Court Department on June 26, 2000.

Following review by this court, 443 Mass. 770 (2005), a motion for a new trial, filed on January 19, 2006, was heard by *Patrick F. Brady,* J.

A request for leave to appeal was allowed by *Spina,* J., in the Supreme Judicial Court for the county of Suffolk.

*Greg T. Schubert* for the defendant.

*Paul B. Linn*, Assistant District Attorney (*Dennis H. Collins*, Assistant District Attorney, with him) for the Commonwealth.

SPINA, J. In 2002, a jury in the Superior Court convicted the defendant of murder in the first degree on a theory of deliberate premeditation for the strangulation death of his estranged wife. We affirmed the conviction and denied relief after reviewing the entire record pursuant to G. L. c. 278, § 33E. See *Commonwealth v. Lao*, 443 Mass 770 (2005). In January, 2006, the defendant, represented by new counsel, filed a motion for a new trial on the ground that his appellate attorney had been ineffective for failing to raise an argument that the admission of certain statements made by his estranged wife under the "excited utterances" exception to the hearsay rule violated his constitutional right to confrontation as set forth in *Crawford* v. *Washington*, 541 U.S. 36 (2004) (*Crawford*), and *Commonwealth* v. *Gonsalves*, 445 Mass. 1 (2005), cert. denied, 126 S. Ct. 2980 and 126 S. Ct. 2982 (2006). The motion was denied by the trial judge.[1] The defendant then sought leave to appeal by petitioning a single justice of this court pursuant to the "gatekeeper" provision of G. L. c. 278, § 33E.[2] The single justice allowed the petition.[3] For the reasons that follow, we conclude that the

[1]The judge denied the defendant's motion for a new trial on the grounds that (1) the defendant's case had already received plenary review pursuant to G. L. c. 278, § 33E; (2) *Crawford* v. *Washington*, 541 U.S. 36 (2004) (*Crawford*), had not been decided at the time of trial; (3) the failure of appellate counsel to raise the confrontation issue was consistent with a strategy of winnowing out weaker arguments; and (4) the contested statements were cumulative of other admissible testimony.

[2]General Laws c. 278, § 33E, provides that, following our plenary review of a conviction of murder in the first degree, "[i]f any motion is filed in the superior court after rescript, no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court."

[3]The United States Supreme Court issued its decision in *Crawford* on March 8, 2004. See *Crawford* v. *Washington, supra*. Appellate counsel here filed the defendant's brief for his direct appeal on April 13, 2004. The defendant's appeal was decided by this court on March 31, 2005. See *Commonwealth* v. *Lao*, 443 Mass. 770 (2005). In his memorandum and order, the single justice noted that, in concluding that application of the principles set forth in *Crawford* likely would have changed the outcome of the defendant's

judge's order denying the defendant's motion for a new trial must be reversed.

1. *Factual background.* We summarize the facts from the court's opinion in *Commonwealth* v. *Lao, supra* at 770-775. The defendant and his wife, Alicia, were separated and had been living apart for approximately one and one-half years before her murder. Even after the defendant moved out of the marital home in Chelsea, the couple stayed in regular contact and had frequent arguments.

On the evening of April 30, 2000, the defendant and Alicia went out to dinner, purportedly to discuss their divorce and the fact that Alicia's boy friend would be moving in with her the next day. When she returned home, Alicia was distraught; she told her teenage daughter, Yessenia, that when the defendant dropped her off, he had tried to run over her with his car. Still crying, Alicia paged the defendant several times. When he answered her page, Alicia asked the defendant why he had tried to run over her, and she threatened to kill him. After the defendant hung up on her, Alicia paged him several more times, but he did not respond. Still upset, Alicia telephoned her mother and recounted what had happened with the defendant. Alicia then made a 911 call to the police. When the police responded to her home, Alicia explained to Officer Eugene Bonita the events that had transpired that evening. Officer Bonita advised Alicia of the process for obtaining a protective order, but she declined to pursue that avenue and said that she would telephone if she needed further police assistance. The evidence supporting these details, and the basis for its admissibility, is the focus of this appeal, and is more fully set forth in the next section of this opinion.

On the morning of May 2, 2000, Alicia's boy friend, Ramon

direct appeal, the chronology of this case limited consideration of the confrontation issue to *Crawford,* itself, and not to the subsequent evolution of the *Crawford* principles as enunciated in *Commonwealth* v. *Gonsalves,* 445 Mass. 1 (2005), cert. denied, 126 S. Ct. 2980 and 126 S. Ct. 2982 (2006), and *Davis* v. *Washington,* 547 U.S. 813 (2006), both of which were decided after the defendant's direct appeal had been adjudicated. See *Griffith* v. *Kentucky,* 479 U.S. 314, 322 (1987) (newly declared constitutional rule must be applied to cases pending on direct review); *Commonwealth* v. *Bray,* 407 Mass. 296, 298-299 (1990).

Rodriguez, entered Alicia's apartment and found her lying unconscious across the bed surrounded by blood. He immediately telephoned 911 (at approximately 10:13 A.M.), tried to administer cardiopulmonary resuscitation (CPR), and waited for the police. Emergency personnel arrived on the scene within minutes, began to perform CPR, and took Alicia to a hospital where she survived in the intensive care unit for nearly two weeks with no brain activity. She was pronounced dead on May 17, 2000.

Between 9 and 9:30 A.M. on May 2, 2000, Jose Santiago and his brother, Carlos Merced, were examining and repairing a tire on a car parked near Alicia's home at 122 Bellingham Street in Chelsea. Santiago's former wife and children lived in an apartment at that address, and he had driven over to pay the rent to his wife's landlord, Francisco Guzman. As Santiago walked to the back of the house, he passed the defendant, whom he had known for several years, and who was walking down the driveway away from the house in the direction of the street. The two men greeted each other. When Santiago reached the rear of the house, he noticed that the back door was open. Concerned for his daughters, Santiago asked Guzman why he had left the door open, to which Guzman replied that he had just locked the door. Santiago then told Guzman, "Well, it must be [the defendant] because I saw him go by the driveway. I bumped into him." Not sure of the exact time of this encounter, Santiago estimated that he saw the defendant approximately thirty minutes before the police arrived. Santiago identified the defendant from a photographic array as the man that he had greeted that morning as the man walked down the driveway.

Later that same day, at approximately 2:30 P.M., the police stopped the defendant, and he voluntarily went to the police station. There, after receiving the Miranda warnings, he answered all questions posed by the police, and denied being anywhere in the vicinity of Alicia's apartment that morning. Instead, he claimed that he left his home around 8 A.M. and went to the South Bay Home Depot store to purchase a door for a job that he had in Waltham, at the home of Yolanda Louis. A store videotape showed that, at approximately 8:50 A.M. on May 2, an individual purchased the specific type of door that was installed

at Louis's home and wheeled it out of the store. A receipt indicating that the door had been purchased at 8:50 A.M. on May 2 was found in the defendant's van. After buying the door, the defendant claimed that he had breakfast at a McDonald's restaurant in the East Boston section of Boston. At approximately 9:15 A.M., the defendant alleged that he telephoned Alicia from a nearby public telephone, spoke with her briefly about medical test results, drove to Waltham, arrived there about 10:30 A.M., and worked on installing the door until 2 P.M.

When the police investigated the crime scene, they found no signs of forced entry, the locks were not broken, and nothing was amiss inside the apartment, except for a knocked-over ashtray in the bedroom. The police discovered bloodstains only in the bedroom where Alicia's body was found. There were no fingerprints that could be lifted, and the footwear impressions taken by the police did not match any footwear taken from the defendant. Tests performed on the defendant's jacket, hat, gloves, and cellular telephone, all recovered from his van, and on the van itself, did not detect any blood.

The medical examiner opined that Alicia's injuries were consistent with someone's hands gripping and applying pressure around her neck. On May 18, 2000, Dr. Alexander Cherkov, a forensic pathologist, performed an autopsy on Alicia's body. He determined her cause of death to be "anoxic encephalopathy," meaning that Alicia's brain had been destroyed by the absence of oxygen caused by strangulation.

2. *Challenged "excited utterances" made by victim.* a. *911 call.* On May 1, 2000, at approximately 12:10 A.M., Alicia dialed 911 and reported that the defendant had threatened to run over her with his car. The tape recording of Alicia's 911 call was played for the jury over the defendant's objection.

b. *Statements to police.* At a pretrial hearing, Officer Bonita testified that, upon his arrival at the house, Alicia told him that she had informed the defendant that she was filing for divorce and that her boy friend would be moving into her apartment the next day. Officer Bonita further testified that Alicia told him that, on returning home from her dinner with the defendant, she got out of his vehicle, he threatened her, he swerved the vehicle

in her direction, and he sped off at a high rate of speed. The judge ruled that Officer Bonita's testimony was admissible under the "excited utterances" exception to the hearsay rule. At trial, Officer Bonita gave the same testimony with respect to the statements made to him by Alicia.

c. *Statements to Yessenia Lao.* During a midtrial voir dire, Yessenia testified that Alicia told her that she (Alicia) had told the defendant that she was divorcing him and that her boy friend would be moving in the next day. Yessenia also testified that Alicia told her that the defendant had tried to run over Alicia with his car after their dinner together. The judge ruled that Yessenia's testimony was admissible under the "excited utterances" exception to the hearsay rule. At trial, however, her testimony was somewhat different from that given during voir dire. Yessenia testified at trial that her mother and the defendant had gone out to dinner together on April 30, 2000. She stated that when Alicia got home, she awoke Yessenia, crying, and she told Yessenia that the defendant had tried to run over her with his car. Yessenia further testified that, once the police arrived at their home, Alicia told the officer that she (Alicia) and the defendant had gone out to dinner, that they had talked about divorce papers and about Alicia's boy friend moving into her apartment, and that the defendant had tried to run over Alicia in his car. Yessenia did *not* testify, as she had during voir dire, that Alicia had told her that she (Alicia) had told the defendant that she was divorcing him and that her boy friend would be moving in the next day.

3. *Standard of review.* Pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), a judge "may grant a new trial at any time if it appears that justice may not have been done." "A motion for a new trial is addressed to the sound discretion of the judge . . . and the judge's disposition of the motion will not be reversed unless it is manifestly unjust . . . or unless the trial was infected with prejudicial constitutional error" (citations omitted). *Commonwealth* v. *Walker*, 443 Mass. 213, 224-225 (2005), quoting *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990). We recognize that "[r]eversal for abuse of discretion is particularly rare where the judge acting on the motion was also the trial judge." *Commonwealth* v. *Walker*,

*supra* at 225, quoting *Commonwealth* v. *Moore, supra.* See *Commonwealth* v. *Zagrodny,* 443 Mass. 93, 103 (2004).

A defendant has a heavy burden to establish ineffective assistance of counsel sufficient to warrant a new trial. The defendant must show that counsel's performance fell "measurably below that which might be expected from an ordinary fallible lawyer," and that this performance "likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). See *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 & n.10 (1977). Once a defendant's direct appeal from his conviction of murder in the first degree has been reviewed under G. L. c. 278, § 33E, "[a]ny claim of ineffectiveness of counsel presented in a subsequent appeal from the denial of a motion for a new trial, authorized by a single justice of this court, [will] not be tested under the § 33E standard but on the applicable constitutional standards, State and Federal." *Commonwealth* v. *Wright,* 411 Mass. 678, 682 n.1 (1992). See *Commonwealth* v. *Phinney,* 446 Mass. 155, 162-163 (2006).

4. *Discussion.* The defendant contends that the "excited utterances" made by Alicia to Yessenia and to Officer Bonita and the tape recording of the 911 call should have been excluded from evidence because they were "testimonial" in nature, pertaining to the reporting of an alleged crime, namely, the defendant's purported attempt to run over Alicia with his vehicle. In light of the fact that these statements were not subject to cross-examination, the defendant argues that they were inadmissible pursuant to the principles enunciated in *Crawford.* Because his appellate counsel failed to raise the confrontation issue on direct appeal, the defendant continues, his counsel's performance was ineffective under the *Saferian* standard. As such, the defendant claims that he is entitled to a new trial.

The Commonwealth, on the other hand, asserts that appellate counsel's failure to raise a *Crawford* claim on direct appeal was not manifestly unreasonable. It points out that the applicability of *Crawford* to the present case was unclear where the Supreme Court did not spell out a comprehensive definition of "testimonial" statements. See *Crawford* v. *Washington,* 541 U.S. 36, 68 (2004). Consequently, the Commonwealth argues, because *Craw-*

*ford* offered little guidance whether excited utterances, such as the ones made by Alicia here, were testimonial, and, therefore, would be barred by the confrontation clause of the Sixth Amendment, there was no ineffective assistance of appellate counsel for not raising a *Crawford* issue.

In light of the fact that the defendant's direct appeal was still pending at the time *Crawford* was decided, the confrontation clause analysis announced therein would have been applicable to the defendant's case. See *Griffith* v. *Kentucky*, 479 U.S. 314, 322 (1987) (newly declared constitutional rule must be applied to cases pending on direct review).[4] Accordingly, we now consider the impact that *Crawford*'s confrontation clause analysis would have had on the defendant's direct appeal so as to evaluate properly his claim of ineffective assistance of appellate counsel. Where the defendant's claim "is predicated, as it is here, on counsel's failure [to raise an issue that is apparent in the record on appeal], the standard for evaluating the ineffectiveness claim is not significantly different from the substantial risk standard that is applicable to our review of the underlying, unpreserved error." *Commonwealth* v. *Azar*, 435 Mass. 675, 686 (2002), and cases cited.

The Sixth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment to the United States Constitution, guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." See *Commonwealth* v. *Saunders*, 435 Mass. 691, 694 n.4 (2002). The right of confrontation also is protected by art. 12 of the Massachusetts Declaration of Rights, which states that in a criminal trial "every subject shall have a right to . . . meet the witnesses against him face to face." Although, in certain circumstances, "art. 12 may provide a criminal defendant more protection than its Federal counterpart, see *Commonwealth* v. *Amirault*, 424 Mass. 618, 631-632 (1997); *Commonwealth* v.

---

[4]The Commonwealth acknowledges that because there was no final adjudication on the defendant's direct appeal when *Crawford* was decided, the defendant's present claim is not barred by *Whorton* v. *Bockting*, 127 S. Ct. 1173, 1180-1184 (2007), in which the Supreme Court concluded that *Crawford* did not apply retroactively to the collateral appeal of a defendant whose conviction became final on direct appeal well before *Crawford* was decided.

*Bergstrom,* 402 Mass. 534, 541-542 (1988), in cases like this one involving the hearsay rule and its exceptions, we have always held that the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment to the United States Constitution. See *Commonwealth* v. *Whelton,* 428 Mass. 24, 28 (1998); *Commonwealth* v. *Childs,* 413 Mass. 252, 260 (1992)." *Commonwealth* v. *DeOliveira,* 447 Mass. 56, 57-58 n.1 (2006).

Prior to the United States Supreme Court's decision in *Crawford,* confrontation clause jurisprudence sometimes permitted the out-of-court statements of an unavailable witness to be admitted at trial. Admissibility was determined by whether the statements bore "adequate 'indicia of reliability.' " *Ohio* v. *Roberts,* 448 U.S. 56, 66 (1980). To satisfy this standard, the testimony either had to fall within "a firmly rooted hearsay exception" or otherwise bear "particularized guarantees of trustworthiness." *Id.* See *Commonwealth* v. *Durling,* 407 Mass. 108, 117-118 (1990) ("In situations where the Commonwealth seeks to rely on evidence not subject to cross-examination, the due process touchstone of an accurate and reliable determination still remains"); *Commonwealth* v. *Trigones,* 397 Mass. 633, 637-638 (1986).

The Supreme Court's decision in *Crawford* rejected the "adequate indicia of reliability" test for out-of-court statements that are "testimonial" in nature. The *Crawford* case concerned the admission in evidence of a tape-recorded statement made by a wife during a police interrogation while in police custody; the wife did not testify at trial on the ground of marital privilege, and her statement was admitted because it bore guarantees of trustworthiness. See *Crawford* v. *Washington,* 541 U.S. 36, 38-42 (2004). In analyzing whether the admission of the statement was constitutionally sound, the Supreme Court relied on a more literal understanding of "the right to be confronted with the witnesses" where testimonial statements are at issue, stating that "[the confrontation clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 61. See *Commonwealth* v. *DeOliveira, supra* at 58. The Court concluded that the confrontation clause of the Sixth Amendment prohibits

the admission of out-of-court statements that are testimonial in nature unless (1) the declarant is available at trial or (2) the declarant is formally unavailable to testify, and the defendant had a prior opportunity for cross-examination.[5] See *Crawford* v. *Washington, supra* at 68. In *Crawford,* the Court deemed the wife's tape-recorded statement made during police interrogation testimonial, and because there had been no cross-examination of the declarant, the confrontation clause of the Sixth Amendment barred its admission. *Id.*

In *Crawford,* the Court declined to articulate a precise and comprehensive definition of "testimonial" statements, leaving that effort for another day. See *Crawford* v. *Washington, supra.* However, in considering the historical underpinnings of the confrontation clause, the Court opined that, broadly speaking, a witness's out-of-court statement was testimonial if it was a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51, quoting Webster's American Dictionary of the English Language (1828). "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford, supra.* The Court then proceeded to announce that certain statements are always considered to be testimonial. At a minimum, "testimonial" statements include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and [statements made during] police interrogations."[6] *Id.* at 68.

Beyond these proscribed categories, the *Crawford* Court

---

[5]Where nontestimonial out-of-court statements are at issue, their admissibility largely will be governed by State hearsay law. See *Crawford* v. *Washington,* 541 U.S. 36, 68 (2004). See also *Commonwealth* v. *Whelton,* 428 Mass. 24, 28-29 (1998) (under Massachusetts law, proof of declarant's unavailability not required for admission of spontaneous utterance).

[6]As to "interrogation" by law enforcement officers, the Court in *Crawford* stated that it "use[d] the term 'interrogation' in its colloquial, rather than any technical legal, sense. . . . Just as various definitions of 'testimonial' exist, one can imagine various definitions of 'interrogation,' and we need not select among them in this case." *Crawford* v. *Washington, supra* at 53 n.4. The term "colloquial" has been defined as "used in or characteristic of . . . familiar and informal conversation." Webster's Third New Int'l Dictionary 446 (1993). We construe the Supreme Court's statement that "interrogation" should be used in its "colloquial" sense to mean that the term should be given its common, everyday understanding. Webster's Third New Int'l Dictionary, *supra* at

discussed a trio of formulations that came within the "core class" of testimonial statements. *Id.* at 51-52. The first formulation encompassed "ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* at 51. The second formulation encompassed "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Id.* at 51-52, quoting *White* v. *Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in judgment). The third formulation encompassed any "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford, supra* at 52.

Against the backdrop of this confrontation clause jurisprudence, we analyze whether the failure of the defendant's appellate counsel to raise a *Crawford* issue with respect to the tape recording of the 911 call and the statements made by Alicia to Yessenia and to Officer Bonita fell measurably below the conduct that might be expected from an ordinary fallible lawyer. We readily acknowledge that the discussion in *Crawford* about "testimonial" statements was not intended to be comprehensive. However, the Court provided sufficient guidance on confrontation clause concerns to warrant exploration by the defendant's counsel on direct appeal, notwithstanding the fact that the exact contours of what constituted a "testimonial" statement for admissibility purposes remained somewhat unclear. The admission of

1182, defines "interrogate" as "question[ing] typically with formality, command, and thoroughness for full information and circumstantial detail." Black's Law Dictionary 838 (8th ed. 2004) provides definitions for three kinds of police interrogation: (1) custodial interrogation — "[p]olice questioning of a detained person about the crime that he or she is suspected of having committed"; (2) noncustodial interrogation — "[p]olice questioning of a suspect who has not been detained and can leave at will"; and (3) investigatory interrogation — "[r]outine, nonaccusatory questioning by the police of a person who is not in custody." The *Crawford* Court noted that a statement "knowingly given in response to structured police questioning" would qualify "under any conceivable definition" of interrogation. *Crawford, supra.*

certain statements made by Alicia was not a weak and insubstantial issue, as the Commonwealth would suggest.

First, as to Alicia's 911 call reporting the defendant's alleged attempt to run over her with his vehicle, the language of *Crawford* suggests that the call would have qualified as a testimonial statement. After Alicia arrived home from dinner with the defendant and before she made the 911 call, Alicia engaged in a conversation with Yessenia about the events of the evening, spoke with the defendant at least once by telephone, and called her mother to discuss the defendant's conduct. Alicia was not in imminent personal peril at the time the 911 call was made because the defendant already had left the scene of the incident. Therefore, Alicia's 911 call was not the reporting of an emergency situation, but, rather, was a "solemn declaration . . . made for the purpose of establishing . . . some fact," namely that the defendant had tried to run over her with his car. *Crawford* v. *Washington, supra* at 51. Because the 911 call was not subject to cross-examination, we conclude that, in all likelihood, it would have been inadmissible pursuant to the principles enunciated in *Crawford.*

Next, as to Alicia's statements to Officer Bonita after he arrived at her home in response to the 911 call, the language of *Crawford* suggests that these statements would have qualified as testimonial. As enunciated in *Crawford,* testimonial statements include those made by an individual during a police interrogation. By construing the term "interrogation" in a colloquial sense, as we must, routine questioning by law enforcement officers to gather thorough and complete information about the possible commission of a crime or other incident would fall within the ambit of "interrogation." Statements made to police in such circumstances would, therefore, be testimonial. Because Alicia's statements to Officer Bonita were not subject to cross-examination, we conclude that, in all likelihood, they would not have been admissible under *Crawford.*

Finally, as to Alicia's statements to Yessenia that the defendant had tried to run over Alicia with his car, the language of *Crawford* suggests that these statements likely would not have been considered testimonial. They were remarks to a relative, not to law enforcement officers, and there is nothing in the record to

suggest that Alicia had any reasonable expectation that these particular comments to her daughter would be used prosecutorially at some later date. As such, the statements would have been admissible. The same cannot be said, however, about Yessenia's testimony at trial describing Alicia's conversation with Officer Bonita. In essence, Yessenia was simply repeating testimonial statements that Alicia had made to the police.[7] These statements did not lose their testimonial character simply because they were heard by Yessenia, who reasonably could have believed, at that point, that the statements would be available for use against the defendant in later criminal proceedings. See *Crawford, supra* at 51-52. We conclude that, in all likelihood, Yessenia's testimony describing Alicia's conversation with Officer Bonita would not have been admissible under *Crawford.*

Given that most of Alicia's statements probably would have been excluded from evidence at trial, we next consider the impact of their use at trial. Based on our review of the record, we hold that once the principles of *Crawford* are applied here, we have a serious doubt whether the admission of the statements at issue did not affect the outcome of the defendant's trial, thereby resulting in a substantial risk of a miscarriage of justice. See *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999).

The defendant asserts that, given the weak and circumstantial nature of the Commonwealth's case against him, evidence as to his motive to murder Alicia was critical to the jury's determination and to this court's decision on his direct appeal. In *Commonwealth* v. *Lao*, 443 Mass. 770, 780 (2005), we acknowledged that the evidence against the defendant was "wholly circumstantial." However, we further opined that "it was sufficient to warrant the jury's conclusion that the defendant killed Alicia and that he did so with deliberate premeditation and malice." *Id.* This determination was based, in significant part, on evidence that the defendant had a motive to kill his estranged

---

[7] During voir dire, Yessenia testified that she had a first-hand conversation with her mother, prior to the 911 call, in which Alicia stated that she had told the defendant that she was divorcing him and that her boy friend would be moving in the next day. The language of *Crawford* suggests that these statements would not have been considered testimonial. However, Yessenia was not specifically asked about this conversation at trial, so she provided no testimony as to its contents.

wife, namely, the termination of their marriage and Alicia's new relationship with Ramon Rodriguez, and on evidence that the defendant was seen outside the marital home around the approximate time of the murder. *Id.* The jury's only sources of motive evidence were the testimony from Officer Bonita about his conversation with Alicia when he responded to her 911 call, and the testimony from Yessenia about that conversation, evidence that, in all likelihood, would have been inadmissible under *Crawford.*[8] Once such evidence is excluded from the jury's consideration, the case largely comes down to one witness's testimony that the defendant was seen outside Alicia's home around the time of the murder, an absence of forensic evidence connecting the defendant to the crime scene, and the defendant's alibi evidence. See *Commonwealth* v. *Lao, supra* at 773-774, 778, 780. Whether the jury's verdict would have been the same absent the motive evidence, a significant part of the Commonwealth's case, is seriously doubtful. Accordingly, we conclude that there has been a substantial risk of a miscarriage of justice, and the defendant is entitled to a new trial.

5. *Conclusion.* The order denying the defendant's motion for a new trial is vacated. The judgment is reversed, and the verdict of murder in the first degree is set aside. The case is remanded to the Superior Court for a new trial.

*So ordered.*

---

[8]The admission of the 911 tape recording was cumulative of properly admitted testimony from Yessenia, so it was unlikely to have affected the outcome of the defendant's trial.