COMMONWEALTH vs. NILE REAVIS.

Suffolk. March 8, 2013. - July 16, 2013.

Present: IRELAND, C.J., CORDY, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* Confrontation of witnesses, Voir dire, Capital case. *Evidence,* Expert opinion, Intent, Intoxication. *Witness,* Expert. *Jury and Jurors. Malice. Intoxication.*

At a murder trial, the erroneous admission of testimony of a substitute medical examiner relating facts in a report created by the medical examiner who had performed the autopsy did not create a substantial likelihood of a miscarriage of justice, where, in the circumstances, it was not improper to permit testimony by a substitute medical examiner; where the cause of death was not in dispute and the statements as to the cause of death and as to the location and extent of the wounds were cumulative of other, properly admitted evidence; and where, on cross-examination, the defendant elicited additional factual information from the substitute medical examiner. [881-885]

At a murder trial, the Superior Court judge did not abuse his discretion in denying the defendant's motion seeking to have each member of the venire questioned individually about his or her experience with domestic violence, where the defendant did not indicate, nor did the record suggest, that any of the jurors selected were not fair and impartial; and where the defendant also did not point to any error in the individual examination of those jurors who responded affirmatively to the judge's question whether any member of the venire felt so strongly about domestic violence that he or she could not be impartial. [885-890]

At the trial of an indictment charging murder in the first degree, the Superior Court judge did not abuse his discretion in denying the defendant's motion, under Mass. R. Crim. P. 25 (b) (2), for a reduction of the verdict to murder in the second degree, where the weight of the evidence did not support a conclusion that the killing was spontaneous or that the defendant was highly intoxicated when he stabbed the victim. [890-894]

INDICTMENT found and returned in the Superior Court Department on January 26, 2007.

The case was tried before *Patrick F. Brady,* J., and a motion for a new trial was heard by him.

*Willie J. Davis* for the defendant.

*Zachary Hillman,* Assistant District Attorney, for the Commonwealth.

LENK, J. The defendant appeals from his conviction of murder in the first degree on a theory of deliberate premeditation for the stabbing death of his wife. The identity of the defendant as the person who stabbed the victim was not a live issue at trial. The defense was based on the theory that the stabbing was not premeditated, and that the defendant should be found guilty of murder in the second degree, both because he was intoxicated at the time of the stabbing and because he was under extreme provocation, having learned that his wife had been unfaithful. The defendant argues that the admission of testimony of a substitute medical examiner violated his rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, and that the judge abused his discretion in denying the defendant's motion for individual voir dire of the venire with respect to their experience with domestic violence. The defendant argues also that it was an abuse of discretion to deny his motion under Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), to reduce the verdict to murder in the second degree.

Concluding that there was no error, and, after review of the entire record pursuant to our responsibility under G. L. c. 278, § 33E, that there is no reason to exercise our power to reduce the defendant's conviction to a lesser degree of guilt or to order a new trial, we affirm.

*Background and prior proceedings.* The defendant and the victim were involved in a romantic relationship for seventeen years and had five children. The defendant was the biological father of the victim's three youngest children; he had known the victim's two older children for most of their lives and viewed them as his own. The relationship between the defendant and the victim was volatile, characterized by verbal outbursts and periods of separation, both before and after they were married in 1999, some years into the relationship.[1] The confrontations involved the defendant's drinking; the victim's going out and

---

[1]The victim had complained frequently to family members about the defendant's drinking and that he would "act out" when he was drunk. At the time of their marriage, the defendant had been sober and attending Alcoholics

staying out late without the defendant; the victim's association with a close friend, Karen Browder;[2] the defendant's suspicion that the victim used drugs and drank heavily with Karen; and the defendant's suspicion that the victim was seeing other men. The defendant also argued with the victim over her attending church and cooking food for members of the church rather than cooking for her family; the defendant accused the victim of having an affair with the minister. The defendant was constantly concerned that the victim was cheating on him and always tried to find out where the victim was going whenever she left the house.

At some point, the victim left the defendant and lived with her four youngest children in a family shelter until a few weeks before the stabbing; during that period, the defendant lived in a rooming house. At the time of the victim's death, the family had only recently been reunited and was living in a two-bedroom apartment in the Dorchester section of Boston. The oldest child was away at college when the family moved into the apartment. The victim and the defendant shared the back bedroom, and the two older boys, Jonathan and Christopher, then fifteen and twelve years old, shared the other bedroom. Cheryl, then eighteen years old, slept on a pallet on the dining room floor; she was planning to leave for college in a few weeks. The youngest boy, five-year-old Justin, sometimes shared the bedroom with his two older brothers and sometimes slept with Cheryl.

Several weeks prior to the stabbing, the defendant accused the victim of having an affair with her friend Karen's nephew, DuJuan Browder.[3] The defendant went to Karen's house, where the victim was visiting, at approximately 5 or 6 P.M. He was acting normally when he arrived; although he smelled of alcohol

Anonymous meetings. He began drinking again two or three years prior to the victim's death.

[2]Karen Browder is a long-time family friend of the victim's family; the victim, her sisters, and Karen grew up together.

Because several family members share last names, we refer to members of the victim's family and the Browder family by their first names.

[3]At the time of the stabbing, DuJuan Browder was also the boy friend of the victim's sister, Kimberly Goss; he lived with Kimberly Goss and her two children in the second-floor apartment in the house where the victim was living in the first-floor apartment.

and appeared to have been drinking, he was not slurring his speech and was not "drunk drunk." After DuJuan came to the house and rang the doorbell, the defendant began accusing the victim of having an affair with DuJuan; he claimed that DuJuan had climbed out the window of a back bedroom and had come around to the front of the house to ring the doorbell. The defendant searched Karen's house, yelling that the only reason the victim was there was because she was having an affair with DuJuan. After DuJuan left, the defendant and the victim stayed for several hours. The defendant had a small bottle of alcohol with him, and drank it while he was at Karen's apartment.

On November 1, 2006, the day before the stabbing, the victim telephoned her sister, Angela Goss, and asked for a ride to do some shopping for household items. Angela took the victim to several stores, then dropped her off at Karen's house. Several hours later, the victim telephoned Angela to pick her up at Karen's house. Angela returned to pick up the victim, and then accompanied her into her apartment, where the victim and the defendant had an argument. The defendant became upset because the victim said she was leaving again with Angela to go to another store. The defendant asked for a ride to work and Angela agreed to drive him as far as a subway station.

While the three were driving to the subway station, the defendant said to Angela, without apparent emotion, "You know your sister and I are getting a divorce?" Angela was not surprised, because the victim had mentioned it to her previously; the victim herself did not respond to the defendant's statement. After they reached the subway station, the victim and the defendant had another argument when the victim requested the defendant's bank automated teller machine (ATM) card; the argument became heated, drawing the attention of passersby, before the defendant handed the victim the ATM card and walked away. Angela dropped the victim off at a bank, and returned home. The victim said she would run some errands and return to Karen's house by bus.

As she had done the previous day, however, the victim actually had intended to purchase and smoke "crack" cocaine with Karen that afternoon. The victim was to supply the money for the purchase, and Karen was to obtain the cocaine. The victim

stopped to pick up Karen, then tried to use the defendant's ATM card to obtain cash for the purchase. When she discovered that the ATM card did not work, the women instead purchased six bottles of beer and a pint of brandy, and went to Karen's house to drink. Around midnight, the defendant arrived at Karen's house carrying an unopened forty-ounce bottle of beer. Karen and the victim were drinking the alcohol. The defendant offered some of his beer to Karen and to the victim. Karen drank a small amount, but the victim refused.

The defendant seemed "fine" when he arrived, but became agitated as he drank the beer, accusing the victim of having an affair. He searched Karen's apartment, saying to Karen, "I know some guy was here, I know somebody was here . . . I know [the victim] was here with a guy, she was with some guy tonight because there's blood on your sheet." Approximately two hours after he arrived, when the defendant told the victim that it was time to leave, Karen was alarmed and suggested that she stay, but the victim declined, saying that the defendant would only make noise and wake everyone if she refused to go with him. When Karen told the victim not to forget to pick her up the following day so that the two could go to a particular store, the defendant said, "You might not see her tomorrow. You might not never see her again." Karen suggested that she telephone the police, but the victim said that she would "be okay" and would just leave with the defendant. Karen asked the victim to telephone her when she got home, but the victim never did so.

The defendant and the victim arrived home at approximately 2:30 A.M. The victim went into the dining room, where her daughter, Cheryl, had been sleeping on the floor with her youngest brother, Justin. The victim climbed into bed next to Cheryl and attempted to go to sleep. The defendant yelled at her to come with him to their bedroom, but the victim refused. The defendant walked past them into the kitchen. He bypassed a small knife lying on a counter, picked up a large knife, returned to the dining room, knelt down next to the victim, and began stabbing her in the left side of the chest. She struggled to get away and was able to stand up, but the defendant began punching and hitting her. As the victim's two older sons entered the

room and tried to pull the defendant from the victim, Cheryl ran upstairs to her aunt's apartment to seek help. She and the aunt telephoned 911, and the aunt then went down to the apartment. The victim was lying on the floor bleeding, and the defendant was pacing back and forth, muttering, "She was cheating on me and she's not going to cheat on me no more." Cheryl testified that, when she returned to the apartment after talking to the emergency dispatcher, the defendant's voice was slurred and he appeared to be drunk; her aunt and DuJuan (her aunt's live-in boy friend) testified that the defendant's speech was not slurred and that he was not difficult to understand.

By the time that paramedics arrived, the defendant had left the apartment. He telephoned the victim's cellular telephone sometime thereafter. When the defendant's son Jonathan answered, the defendant said that he was sorry for hurting Jonathan's mother and that he did not deserve to live. Several hours after the stabbing, the defendant arrived at his sister's house, badly injured, rambling in his speech and not making sense, and having serious difficulty breathing; his sister described his appearance as looking like he had been run over by a truck and dragged ten miles. He told his sister that he had stabbed the victim in the left side of her chest and jumped from a train overpass because he did not want to live. The defendant's brother-in-law drove him to Boston Medical Center, where the defendant was arrested.

Following his conviction by a Superior Court jury, the defendant filed a motion for a new trial, arguing that his trial counsel had ignored his requests to attempt to reach a plea arrangement and had refused to enter into plea negotiations. That motion was denied after an evidentiary hearing at which both trial counsel and the trial prosecutor testified that counsel had attempted a number of times to enter into a plea agreement with the Commonwealth, but that the prosecutor, after consultation with her superiors, had declined to accept a plea to murder in the second degree.

The defendant subsequently filed a motion pursuant to Mass. R. Crim. P. 25 (b) (2), seeking to have the verdict reduced to a lesser degree of guilt. The motion judge, who was also the trial judge, denied the motion. Because, as the defendant states in

his brief, the "assertions of the defendant" made in his motion for a new trial "could not be substantiated" after the evidentiary hearing on that motion,[4] the denial of the motion for a new trial was not pursued on appeal; the defendant pursues only claims related to the denial of his motion to reduce the verdict. Those claims have been consolidated with his direct appeal.

*Discussion.* 1. *Substitute medical examiner.* The defendant argues that the Commonwealth did not establish that the medical examiner who performed the autopsy was unavailable, and that testimony by the substitute medical examiner violated the defendant's State and Federal rights to confrontation. At trial, the defendant did not object to the use of a substitute medical examiner; to the contrary, when the prosecutor presented her motion in limine that a substitute medical examiner be permitted to testify, defense counsel replied, "No objection," and the motion was allowed as unopposed. Nor did the defendant object to the substitute medical examiner's testimony as it was introduced. Therefore, we review for a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Emeny*, 463 Mass. 138, 145 (2012).

By the time of trial, Dr. Elizabeth Bondock, the medical examiner who performed the autopsy, had left the medical examiner's office and moved to Vermont. On that basis, the judge allowed the Commonwealth's motion that a substitute medical examiner, Dr. John Parker, be allowed to testify. The defendant argues that testimony by a substitute medical examiner was improper where the Commonwealth did not establish that the medical examiner who performed the autopsy was unavailable. The defendant contends that the city where Bondock now lives is not so far from Boston as to preclude her from appearing in Boston to testify.

A substitute medical examiner who testifies in such circumstances is available for cross-examination as to any opinions he or she offers at trial. We have never stated that a substitute medical examiner may not testify to his or her own opinions unless the medical examiner who performed the autopsy is

---

[4]The judge found the testimony of both the defendant's trial counsel and the prosecutor, supported by other documentation of trial counsel's efforts to negotiate a plea prior to trial, credible, "emphatic," and "abundantly clear."

shown to be unavailable, nor is there any rule of criminal procedure setting forth such a requirement. That Bondock was no longer employed by the office of the medical examiner, and had moved out of the Commonwealth, adequately explains the use of a substitute medical examiner in this case.[5] See *Commonwealth v. Rivera*, 464 Mass. 56, 76-78, cert. denied, 133 S. Ct. 2828 (2013) (testimony by substitute medical examiner proper where medical examiner who performed autopsy was no longer employed by medical examiner's office at time of trial but no inquiry was made as to her unavailability); *Commonwealth v. Leng*, 463 Mass. 779, 783-784 (2012) (affirming use of testimony by substitute medical examiner where no reason was given for calling substitute to testify); *Commonwealth v. Durand*, 457 Mass. 574, 582-585 (2010) (substitute medical examiner properly permitted to testify where medical examiner who performed autopsy, who was no longer employed by medical examiner's office but who resided in Massachusetts at time of trial, was not shown to be unavailable).

Moreover, nothing in the record supports the defendant's speculation, citing *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), and *Commonwealth v. Munoz*, 461 Mass. 126, 132 & n.10 (2011), judgment vacated on another ground, 133 S. Ct. 102 (2012), that the medical examiner's departure from employment by the Commonwealth might not have been voluntary and might have been "work related." In the circumstances, it was not improper to permit testimony by a substitute medical examiner.

Based on his review of the autopsy report, the toxicology

---

[5]The defendant's contention that the Commonwealth must show the unavailability of the medical examiner who performed the autopsy before being allowed to offer the more limited opinion testimony of a substitute medical examiner appears to rest on a misconception. The defendant appears to have conflated the confrontation clause analysis necessary to introduce out-of-court statements by the medical examiner, such as those in an autopsy report, with the introduction of expert opinion testimony given at trial by a substitute medical examiner. While the Commonwealth would have to show the medical examiner's unavailability, and the defendant's prior opportunity to cross-examine her, if the Commonwealth wanted to offer, consistent with the confrontation clause, testimonial out-of-court statements by that medical examiner, see, e.g., *Commonwealth v. Phim*, 462 Mass. 470, 479 (2012), citing *Commonwealth v. Nardi*, 452 Mass. 379, 388, 391 & n.13 (2008), that is not the situation here.

report, and the autopsy photographs, the substitute medical examiner testified to the cause of death, and also described the number, nature, and location of the victim's wounds. He offered his opinion as to the length of time that the victim could have "move[d] around" after the stabbing and the symptoms she would have experienced.

A substitute medical examiner who did not perform the autopsy may offer an opinion on the cause of death, based on his review of an autopsy report by the medical examiner who performed the autopsy and his review of the autopsy photographs, as these are documents upon which experts are accustomed to rely, and which are potentially independently admissible through appropriate witnesses. See *Commonwealth* v. *Emeny, supra* at 145, citing *Commonwealth* v. *Avila,* 454 Mass. 744, 760 (2009). "[Medical] examiners, as expert witnesses, may base their opinions on (1) facts personally observed; (2) evidence already in the records or which the parties represent will be admitted during the course of the proceedings, assumed to be true in questions put to the expert witnesses; and (3) 'facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion.' " *Commonwealth* v. *Nardi,* 452 Mass. 379, 388 (2008), quoting *Commonwealth* v. *Markvart,* 437 Mass. 331, 337 (2002). A substitute medical examiner may also offer an expert opinion as to the time that would have elapsed between injury and death, the force required to inflict the injury, and the effect that certain types of injuries would have upon a victim. See *Commonwealth* v. *Avila, supra* at 760-761, discussing *Commonwealth* v. *Nardi, supra* at 398-391. A substitute medical examiner may not, however, testify to facts in the underlying autopsy report where that report has not been admitted. See *Commonwealth* v. *Emeny, supra*; *Commonwealth* v. *Avila, supra* at 760, citing *Commonwealth* v. *Nardi, supra* at 390-393. See also *Williams* v. *Illinois,* 132 S. Ct. 2221, 2228 (2012). Thus, portions of the substitute medical examiner's testimony here, including his testimony about the number and location of the wounds, were improper and should not have been admitted.

Nonetheless, the admission of this testimony did not create a substantial likelihood of a miscarriage of justice. The cause of

death was not in dispute, and the statements as to the cause of death and as to the location and extent of the wounds were cumulative of other, properly admitted evidence. See *Commonwealth* v. *Phim*, 462 Mass. 470, 478-480 (2012) (no substantial likelihood of miscarriage of justice where substitute medical examiner testified improperly as to facts underlying cause of death, since cause of death by gunshot was not contested and substitute medical examiner's testimony had no bearing on key issue at trial, whether defendant had participated in shooting); *Commonwealth* v. *Rogers*, 459 Mass. 249, 266, cert. denied, 132 S. Ct. 813 (2011) (error harmless where facts relative to cause of death introduced improperly by substitute medical examiner were cumulative of other evidence).

Here, too, the improperly admitted testimony concerning the nature of the victim's injuries was cumulative of substantial other testimony and not relevant to any contested issue at trial. A Boston police officer who arrived on the scene testified to his observations of the victim lying on the floor surrounded by a large pool of blood; an emergency medical technician who treated the victim at the scene testified to the victim lying on the floor with a stab wound to her heart; and the victim's daughter Cheryl testified to seeing the defendant stab the victim with a kitchen knife on the left side of her chest. A Boston police officer who observed the autopsy testified to his observations concerning the location of the wounds and the accuracy of the autopsy photographs. The defendant's statement that he stabbed the victim in the left side of her chest was also introduced in evidence through the defendant's sister. In addition, the properly admitted autopsy photographs showed the number and location of the wounds, and the victim's medical records from her treatment in the emergency room at Boston Medical Center were admitted in evidence.

Moreover, on cross-examination, the defendant elicited additional factual information from the substitute medical examiner. Defense counsel established on cross-examination that the victim did not have any wounds to her face or head, and did not have any broken bones other than the rib through which she had been stabbed. While the substitute medical examiner's statement that the defendant's medical records showed no alcohol in his system

at 10 A.M. on the morning of November 2, 2006, should not have been admitted, the defendant thereafter elicited on cross-examination that he could have been legally intoxicated at 3 A.M. yet have tested negative for alcohol at 10 A.M. See *Commonwealth v. McCowan*, 458 Mass. 461, 481-482 (2010) (no substantial likelihood of miscarriage of justice where defendant relies on erroneously admitted facts contained in autopsy report to challenge Commonwealth's theory of guilt).

The testimony concerning the location and extent of the victim's wounds might have been relevant to a determination that the stabbing was committed with extreme atrocity or cruelty. See *Commonwealth v. Rodriguez*, 457 Mass. 461, 478-481 (2010), overruled on another ground, *Marshall v. Commonwealth*, 463 Mass. 529, 535 (2012). However, where the jury rejected that theory of murder, the defendant has not shown any harm from the erroneous introduction of the substitute medical examiner's testimony, much less a substantial likelihood of a miscarriage of justice. Contrast *Commonwealth v. Durand*, *supra* at 587 (error not harmless where substitute medical examiner testified to factual findings in autopsy report supporting substitute's opinion on contested issue of time and manner of death and question of whether killing was committed with extreme atrocity or cruelty).

2. *Individual voir dire.* The defendant filed a motion in limine seeking to have each member of the venire questioned individually about his or her experience with domestic violence.[6] Defense counsel argued that potential jurors often did not respond to questions about restraining orders on the juror questionnaire, and that, "especially in the immigrant community, there still is some inhibition in declaring in public, so-to-speak, that they're either a victim or perpetrator of domestic violence." Counsel

---

[6]The defendant's motion requested that members of the venire be asked,

"This case involves an alleged instance of what is commonly referred to as 'domestic violence,' that is violence allegedly committed between family members. Does this aspect of the case affect your ability to be impartial in this matter and listen to the evidence with an open mind?"

The defendant also proposed several additional questions, among them, "Have you, a close friend or a close family member ever been a victim of, or a witness to, domestic violence?"

maintained that, in his experience, "people are just inhibited from answering that honestly and that's the crux of this case."

The judge denied the motion, stating that domestic violence was not similar to issues such as those involving racial prejudice or sex offenses against children, where potential jurors might not be willing to respond affirmatively to any collective question posed to all members of the venire. See *Commonwealth* v. *Lopes*, 440 Mass. 731, 735-737 (2004). Over the defendant's objection, the judge instead asked a general question whether any member of the venire felt so strongly against domestic violence that he or she would be unable to be impartial.[7] Before he did so, the judge explained that the case involved allegations of domestic violence, and that the Commonwealth asserted that the defendant killed his wife. The judge also emphasized several times, in drawing prospective jurors' attention to the juror questionnaires they were to have completed, see G. L. c. 234A, § 22, that they should consider carefully whether they had ever taken out, or been the subject of, a G. L. c. 209A restraining order. Noting that this point might have been overlooked or unclear, he urged potential jurors to come forward and talk to him privately at sidebar if any of the information on those forms might be incomplete.

The question on domestic violence was the last in a series of questions. The questions that had already been posed to the venire were those required by statute, see note 9, *infra*, and those requested by the Commonwealth, to which no objection had been lodged.[8] As each question was asked, the clerk recorded the juror number of any prospective juror answering affirmatively. Then, the judge examined individually at sidebar each prospective juror who had responded in the affirmative to

---

[7]The judge asked,

"[D]oes anyone here have such strong feelings against the general subject of domestic violence that that might interfere with their duty to judge this particular case fairly and impartially, based upon the evidence introduced here in the courtroom and on the law that I explain to the jury?"

[8]The defendant filed a pretrial motion requesting a number of questions be posed to the venire; that motion was not acted upon prior to trial. At trial, the defendant sought no specific questions other than the one on domestic violence.

any of the questions. Twelve potential jurors responded affirmatively to the question on domestic violence, and ten were excused. The others were found able to be impartial.

General Laws c. 234, § 28, sets forth specific questions that, upon request, must be asked of the venire as a whole.[9] These include whether a prospective juror has formed an opinion or is aware of any bias or prejudice he or she may have, and, in a criminal case, whether the juror understands that a defendant is presumed innocent and that the Commonwealth bears the burden of proving guilt beyond a reasonable doubt. *Id.* Apart from these specific questions, and certain limited circumstances in which we have required individual voir dire, see *Commonwealth* v. *Lopes, supra* at 736-737, and cases cited, a trial judge has broad discretion in determining how a jury will be selected and which questions will be posed to members of the venire. "The scope of voir dire rests in the sound discretion of the trial judge, and a determination by the judge that a jury are impartial will not be overturned on appeal in the absence of a clear showing of abuse of discretion or that the finding was clearly erroneous." *Commonwealth* v. *Lopes, supra* at 736. "The goal of permitting questioning of prospective jurors is to provide a defendant with a competent, fair, and unbiased jury. A trial judge, who is aware of the facts of a particular case and can observe firsthand the demeanor of each prospective juror, is in the best position to determine what questions are necessary reasonably to ensure that a particular jury can weigh and view the evidence impartially." *Id.*

Notwithstanding this broad discretion, in certain limited

---

[9] Pursuant to G. L. c. 234, § 28, upon motion by either party, a judge must inquire of a prospective juror,

> "to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead. In a criminal case such examination shall include questions designed to learn whether such juror understands that a defendant is presumed innocent until proven guilty, that the commonwealth has the burden of proving guilty beyond a reasonable doubt, and that the defendant need not present evidence in his behalf."

circumstances where extraneous influences will likely influence prospective jurors, we have said that individual voir dire is required upon request. "This court has concluded that cases involving interracial murder, interracial rape, and sexual offenses against children where the victim and the defendant are of different races present, as a matter of law, a substantial risk that extraneous issues will likely influence prospective jurors, and in such cases, individual questioning with respect to racial prejudice, on request, is mandatory." *Commonwealth* v. *Lopes, supra* at 737, and cases cited. See *Commonwealth* v. *Young,* 401 Mass. 390, 398 (1987), overruled in part on another ground, *Commonwealth* v. *Ramirez,* 407 Mass. 553, 555 (1990) (interracial murder); *Commonwealth* v. *Hobbs,* 385 Mass. 863, 873 (1982) (interracial sex offenses against children); *Commonwealth* v. *Sanders,* 383 Mass. 637, 640-641 (1981), overruled in part on another ground, *Commonwealth* v. *Ramirez, supra* (interracial rape). Similarly, we have required individual voir dire upon request where a crime involves a sex offense against a minor, *Commonwealth* v. *Flebotte,* 417 Mass. 348, 355 (1994), and where the defendant intends to introduce a defense of lack of criminal responsibility. *Commonwealth* v. *Seguin,* 421 Mass. 243, 249 (1995), cert. denied, 516 U.S. 1180 (1996).

The defendant asserts that domestic violence went to the heart of the case, and that, in these circumstances, it was an abuse of discretion not to examine each member of the venire individually. The defendant points to G. L. c. 234, § 28, which provides, in relevant part:

> "For the purpose of determining whether a juror stands indifferent in the case, if it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall, or the parties or their attorneys may, with the permission and under the direction of the court, examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any

other matters which may, as aforesaid, cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case. Such examination may include a brief statement of the facts of the case, to the extent the facts are appropriate and relevant to the issue of such examination, and shall be conducted individually and outside the presence of other persons about to be called as jurors or already called."

He notes that the crime was "very gruesome," was committed against the defendant's wife in the presence of their children, and involved drugs and alcohol, as well as assertions of the defendant's "paranoia" about his wife being unfaithful.

As in *Commonwealth* v. *Lao*, 443 Mass. 770, 778 (2005), *S.C.*, 450 Mass. 215 (2007), and 460 Mass. 12 (2011), "[t]he present case does not involve any of these circumstances [where individual voir dire has been held necessary due to the likelihood of extraneous influences], and we decline to expand the categories of cases for which individual voir dire is mandatory." The defendant in that case killed his wife after a history of repeated confrontations over his efforts to control her activities outside the home. *Id.* at 771. The judge in that case (who was also the trial judge in this case) told the venire that the case involved an allegation the defendant had killed his wife and then asked the venire collectively if they were aware of any bias or prejudice for or against either party, or knew of any reason that they could not be fair and impartial. *Id.* at 775-776. Although the term "domestic violence" was not used explicitly, some members of the venire were excused after they explained at sidebar that they would be unable to be fair and impartial in a case involving domestic violence. *Id.* at 776. We affirmed, declining to expand the categories of cases for which individual voir dire is required.

Here, by contrast, the judge asked a much more specific and focused question, whether any member of the venire felt so strongly about domestic violence that he or she could not be impartial. In denying the defendant's motion for individual voir dire, and rejecting the questions proposed by the defendant, the judge explained that he believed his more general question, unlike the defendant's proposed questions, did not require potential

jurors to identify that they had had any personal experience with domestic violence, whether as victims or otherwise. Given this, and unlike the situation requiring prospective jurors to identify themselves as having been sexually molested or as having some racial bias, he did not believe prospective jurors would be reluctant to answer the general question on domestic violence.

The defendant has not indicated, nor does the record suggest, that any of the jurors selected were not fair and impartial. The defendant also points to no error in the individual examination of those jurors who responded affirmatively to the question on domestic violence, or to any of the other questions. The judge examined carefully each prospective juror who responded affirmatively, and, at times, sought opinions from both counsel. "Juror bias is a question of fact to be determined by the judge. A finding that a juror is impartial will not be overturned on appeal unless the defendant makes a clear showing of abuse of discretion or that the finding was clearly erroneous." *Commonwealth* v. *Emerson*, 430 Mass. 378, 384 (1999), cert. denied, 529 U.S. 1030 (2000). We conclude that there was no abuse of discretion.[10]

3. *Motion to reduce verdict.* After his motion for a new trial was denied, the defendant moved under Mass. R. Crim. P. 25 (b) (2) for a reduction of the verdict to murder in the second degree. In support of this motion, the defendant relied in large part on his testimony at the hearing on the motion for a new trial to the effect that he had problems with alcohol dependency,

---

[10]Nonetheless, we do not intend to suggest that the procedure followed here, or in *Commonwealth* v. *Lao*, 443 Mass. 770, 778 (2005), *S.C.*, 450 Mass. 215 (2007), and 460 Mass. 12 (2011), was necessarily the best practice. In many instances, individual voir dire on the issue of domestic violence may well be the more appropriate procedure. See generally *Opinion of the Justices*, 427 Mass. 1201, 1208-1210 (1998); *Commonwealth* v. *Pierowski*, 54 Mass. App. Ct. 707, 711 (2002); L. Haren & J. Radford, Tackling Domestic Violence: Theories, Policies, and Practice (2008); Dutton, Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome, 21 Hoftsra L. Rev. 1191 (1993).

We note as well that, before posing the question, the judge told the venire that the court presumed that most prospective jurors would be against domestic violence, and that his question was whether any prospective juror had such strong feelings that it would not be possible to be impartial. To the extent that such comments could be understood as discouraging prospective jurors from responding affirmatively to the posed question, they are better avoided.

and that he had been drunk and high on drugs on the night of the stabbing. He argued that the circumstances of the stabbing, including the use of a kitchen knife, indicate a lack of premeditation. He emphasized also that he was suffering from a paranoid belief, supported by testimony at trial as to his sudden changes in demeanor and searching of Karen's apartment, that his wife was cheating on him. Noting that the prosecutor refused to accept a plea to murder in the second degree and that the jury, who were instructed on murder in the second degree, chose to convict the defendant of murder in the first degree, the motion judge, who was also the trial judge, denied the motion.

We review a judge's decision not to reduce a verdict under Mass. R. Crim. P. 25 (b) (2) for abuse of discretion. See *Commonwealth* v. *Almeida*, 452 Mass. 601, 613 (2008). "We defer to the trial judge because he has the advantage of face to face evaluation of the witnesses and the evidence at trial. He is in a far better position than we are to make the judgment required by the rule." *Commonwealth* v. *Woodward*, 427 Mass. 659, 668 (1998), quoting *Commonwealth* v. *Cobb*, 399 Mass. 191, 192 (1987). "We have made it clear that under rule 25 (b) (2), a judge may review all the evidence, including the defendant's version of the facts, in deciding whether the verdict comports with justice, even when the evidence warranted the jury's verdict." *Commonwealth* v. *Woodward*, *supra* at 668.

As the defendant asserts, a judge considering a motion to reduce a verdict under Mass. R. Crim. P. 25 (b) (2) may rely on essentially the same considerations as does this court when deciding whether to reduce a verdict to a lesser degree of guilt pursuant to G. L. c. 278, § 33E. *Commonwealth* v. *Rolon*, 438 Mass. 808, 820-821 (2003). The defendant contends that, while the evidence here could support a conviction for murder in the first degree, the issue before the motion judge, which the judge declined to consider, was whether a verdict of murder in the second degree is more "consonant with justice." See *Commonwealth* v. *Rolon*, *supra.* Cf. *Commonwealth* v. *Gilbert*, 447 Mass. 161, 166-168 (2006).

"The judge's option to reduce a verdict offers a means to rectify a disproportionate verdict, among other reasons, short of granting a new trial. . . . The judge's power under rule

25 (b) (2), like our power under G. L. c. 278, § 33E, may be used to ameliorate injustice caused by the Commonwealth, defense counsel, the jury, the judge's own error, or . . . the interaction of several causes." *Commonwealth* v. *Woodward, supra* at 667. We have affirmed reductions in a verdict of murder in the first degree where the evidence warranted the verdict, but conviction of a lesser offense was "more consonant with justice." See, e.g., *Commonwealth* v. *Woodward, supra* at 672; *Commonwealth* v. *Ghee,* 414 Mass. 313, 321 (1993); *Commonwealth* v. *Keough,* 385 Mass. 314, 319-321 (1982); *Commonwealth* v. *Gaulden,* 383 Mass. 543, 555-558 (1981).

As stated, in denying the defendant's motion, the judge relied primarily on the prosecutor's refusal to accept a plea to murder in the second degree, and the jury's decision not to convict on murder in the second degree. The defendant maintains that the judge erred in denying his motion on these grounds. The defendant argues, essentially, that the judge misconstrued the extent of his discretion. The defendant points to Cheryl's testimony at sentencing, in which she spoke of her ongoing love for her father, and the judge's comment that the situation was a terrible tragedy, but he had no discretion not to impose the mandatory life sentence without possibility of parole. The defendant contends that the judge did have discretion to reduce the verdict according to Mass. R. Crim. P. 25 (b) (2), and abused his discretion in declining to do so. Rather than relying on determinations by the prosecutor and the jury verdict, which will ordinarily have been decided against the defendant where a rule 25 (b) (2) motion is filed, the defendant asserts that the judge should have considered other factors indicating that a verdict of murder in the second degree is more consonant with justice.

The defendant points out that, where a conviction of murder in the first degree is based on a theory of premeditation, the primary consideration in whether to reduce a verdict is "whether the killing reflects 'spontaneity rather than premeditation.' " *Commonwealth* v. *Ruci,* 409 Mass. 94, 98 (1991), quoting *Commonwealth* v. *Garabedian,* 399 Mass. 304, 317 (1987). The defendant contends that the stabbing of his wife was spontaneous rather than premeditated, and was heavily influenced by his impaired, drunken state on the night of the killing.

We discern no abuse of discretion. A judge may properly reduce a verdict where, "although 'technically sufficient to support the verdict,' " the weight of the evidence "points to a lesser crime." See *Commonwealth* v. *Almeida, supra* at 613-614, quoting *Commonwealth* v. *Rolon, supra* at 821. "We have recognized the propriety of a discretionary reduction of a verdict of murder in the first degree when the evidence of premeditation was slim." *Commonwealth* v. *Ghee, supra.* In deciding a motion under Mass. R. Crim. P. 25 (b) (2), however, a judge is not to second guess the determination of the jury, nor to reduce a verdict, based on extraneous factors, where such a verdict would be inconsistent with the weight of the evidence. See *Commonwealth* v. *Rolon, supra* at 822; *Commonwealth* v. *Gaulden, supra* at 557.

The weight of the evidence here does not support a conclusion that the killing was spontaneous or that the defendant was highly intoxicated when he stabbed the victim. The evidence introduced at trial showed only that the defendant had consumed forty ounces of beer over one and one-half hours. Although Cheryl testified that the defendant's speech was slurred, none of the witnesses testified that he was having trouble walking or expressing himself. Cheryl testified that the defendant moved deliberately to the kitchen, and came back a few seconds later, having bypassed a smaller knife in favor of a larger one. He knelt down over the victim, who was lying down, and began stabbing her. Autopsy photographs showed defensive cuts on her arms, and the testimony indicated that, having let go of the knife, the defendant continued to hit and punch the victim after she had struggled to stand up.

In contrast to cases cited by the defendant, nothing in the record here shows any weakness in the evidence of premeditation or that evidence of malice was lacking. There was no evidence to the effect that, immediately prior to the stabbing, the victim had engaged in any confrontation with the defendant, or that the defendant had discovered the victim in the act of adultery. To the contrary, and pertinent to the question of premeditation, there was evidence at trial that, on the day before the stabbing, the defendant told his sister-in-law that he and the victim were getting a divorce. Further, a few hours before the stabbing,

while at a different apartment, the defendant told the victim's friend that she might not see the victim ever again. Immediately after the stabbing, the defendant walked around the victim's body, muttering, "She was cheating on me and she's not going to cheat on me no more," suggesting the defendant's view that he had accomplished his plan to prevent the victim from cheating again. Contrast *Commonwealth* v. *Millyan*, 399 Mass. 171, 188-189 (1987); *Commonwealth* v. *Seit*, 373 Mass. 83, 95 (1977); *Commonwealth* v. *Ransom*, 358 Mass. 580, 583 (1971); *Commonwealth* v. *Baker*, 346 Mass. 107, 119 (1963).

Moreover, the defendant's testimony as to his drug and alcohol use, cited by the defendant in support of his argument that there was an absence of premeditation, was not introduced at trial but, rather, only at a hearing on his motion for a new trial. While a judge properly may consider, and rely on, a defendant's trial testimony in deciding whether to reduce a verdict, see *Commonwealth* v. *Keough*, *supra* at 319-321, the defendant's testimony here has no bearing on whether the verdict should be reduced.

4. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our obligation under G. L. c. 278, § 33E, and discern no basis for granting extraordinary relief.

*Judgment affirmed.*