COMMONWEALTH vs. REMEL AHART.

Middlesex. November 9, 2012. - March 1, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Homicide. Witness,* Cross-examination, Bias, Credibility. *Practice, Criminal,* Capital case, Argument by prosecutor, Sequestration of witnesses.

There was no merit to a murder defendant's claim that the trial judge improperly limited defense counsel's cross-examination of the Commonwealth's principal witness on the matter of bias, where the challenged questions asked the witness for legal opinions that he had not been shown to be qualified to give, and where the subject of bias had otherwise been explored extensively [440-441]; further, the prosecutor did not improperly vouch for the witness in registering his objection to the first challenged question [441-442].

At a murder trial, a police officer's testimony, in which he described the steps taken in the investigation to corroborate through independent evidence the account of the Commonwealth's principal witness, did not constitute improper vouching for the testimony of that witness. [442-443]

A criminal defendant failed to demonstrate that the judge abused his discretion in declining to sequester two witnesses essential to the management of the case. [443]

At a murder trial, the prosecutor's closing argument was based soundly in the evidence, together with reasonable and possible inferences that could have been drawn therefrom [443-444]; further, certain statements in the prosecutor's closing argument, in which he neither expressed his personal belief in the credibility of a testifying police officer nor indicated that he possessed knowledge independent of the evidence before the jury, did not constitute impermissible vouching for that witness's credibility [444-445].

INDICTMENTS found and returned in the Superior Court Department on August 14, 2006.

The cases were tried before *Thomas P. Billings*, J.

*Leslie W. O'Brien* for the defendant.

*John C. Verner*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree of the victim, Corey Davis (Corey), on theories of deliberate premeditation and extreme atrocity or cruelty. He also was

convicted of armed assault with intent to murder of Troy Davis (Troy), and two counts of illegal possession of a firearm. On appeal the defendant asserts error in (1) the judge's limitation of cross-examination of James Miller, the Commonwealth's principal witness; (2) the admission of a police officer's testimony vouching for Miller's testimony; (3) the failure to sequester the police witness who vouched for Miller's testimony; and (4) the prosecutor's improper vouching for Commonwealth witnesses and misstating evidence during his closing argument. He further contends that the cumulative effect of these errors, none of which was preserved except the question of sequestration, deprived him of a fair trial. We affirm the conviction and decline to grant relief under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. Sherrod Bright (Sherrod) believed Corey had stolen $15,000 from him. He offered the defendant $6,000 to kill Corey. He paid the defendant one-half "up front," with the balance due upon completion of the job. During the evening of March 18, 2006, the defendant and Ahmad Bright (Bright), the codefendant[1] who is Sherrod's brother, traveled in a grey Jeep Cherokee to Upton Street in Cambridge, where they picked up James Miller. They tried to recruit Miller to help them kill Corey. Miller told them he would have no part of it, as Corey was a friend. The three men traveled around Cambridge looking for Corey. Miller was the Commonwealth's key witness at trial.

Shortly before midnight they spotted Corey's vehicle and followed him. They found Corey's vehicle parked on Hamilton Street in Cambridge. Bright, who was driving the Jeep, parked a few blocks away, on Pacific Street. After throwing their cellular telephones into the back seat of the Jeep, the defendant, armed with a nine millimeter semiautomatic handgun supplied earlier that night by Sherrod, and Bright, armed with a .38 caliber revolver, proceeded on foot toward Corey's vehicle. The defendant had kept both weapons under his control while they were traveling. Both the defendant and Bright were wearing gloves, and they had different-colored hooded sweatshirts.

---

[1] Ahmad Bright was tried separately and convicted of murder in the second degree. His conviction was affirmed on appeal. See *Commonwealth* v. *Bright*, 463 Mass. 421, 422-423 (2012).

After the defendant and Bright left, Miller got out of the Jeep and made a call on his cellular telephone to Corey, telling Corey to meet him immediately on Pearl Street. Miller, fearing for himself, did not tell Corey that the defendant and Bright had just set out to kill him. Miller then made a cellular telephone call to his girl friend. Cellular telephone records indicated that this occurred at 11:53 P.M.

In the meantime, Corey and his cousin Troy were sitting in Corey's vehicle smoking marijuana. Less than thirty seconds after Miller's cellular telephone call to Corey ended, the defendant opened the back door of Corey's car and shot Corey. Troy ran from the car. Bright aimed at Troy but the ammunition in the revolver failed to discharge. The defendant then shot at Troy but missed. Corey tried to flee but collapsed outside his car. He was taken to a local hospital where he died from his gunshot wounds.

The defendant and Bright fled, throwing their weapons into a construction site as they ran. They encountered Miller on Watson Street and demanded that he return to the Jeep with them. Fearing for his life, Miller complied. Once inside the Jeep, the defendant said they had "got[ten]" Corey, and he warned Miller that he "better not say anything."

Within thirty seconds of hearing the shots, a Hamilton Street resident telephoned 911. Cambridge emergency communications received the call at 11:53 P.M. Police units were dispatched immediately. Cambridge police Sergeant George Sabbey arrived at the scene at 11:56 P.M. As he was speaking with Troy near the intersection of Hamilton and Pearl Streets, Troy pointed to a grey Jeep Cherokee speeding down Pearl Street and exclaimed, "That's the car, that's the car." He had seen the defendant and Bright in the Jeep at a Cambridge housing project a few weeks earlier.

The guns were recovered by police. Deoxyribonucleic acid (DNA) testing done on the guns indicated that Sherrod was a major contributor to swabbings taken from the trigger of the nine millimeter handgun.

The defendant arranged a meeting with Sherrod and Miller several days after the murder to discuss an alibi. After he was arrested, the defendant had a telephone conversation with his

girl friend from the house of correction where he was being held pending trial. During that conversation they devised an alibi. The conversation had been tape recorded, and it was played to the jury. Cellular telephone records contradicted their alibi by showing that the defendant and his girl friend were not together at the time of the crime, which she admitted at trial.

The defense at trial, developed through cross-examination of Commonwealth witnesses and closing argument, was that Miller was not a credible witness, and that it was Miller who had killed Corey. Miller's cellular telephone records and corresponding cellular tower records indicated that Miller was in a location several blocks away from the murder scene at the time Corey was shot. Similar records for the defendant's and Bright's cellular telephones indicated they were not in use in the minutes before and after the shooting. They also showed the movements of the trio around Cambridge and Dorchester (where Bright lived) that corroborated much of Miller's testimony about their activities that night.

2. *Limitation on cross-examination.* The defendant argues that the judge's limitation on his cross-examination of Miller on the matter of bias violated his right of confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. The defendant's claim is based on two rulings where the judge sustained objections to the following questions asked by trial counsel, while cross-examining Miller:

> (1) "Do you know that the story you tell, about driving with soon-to-be murderers in the car, yourself, that that could be considered as being an accessory before the fact of murder?"

> (2) "Do you know that it puts you in joint enterprise with the people you're talking about, for the crime of murder?"

The questions, as phrased, were objectionable. They asked Miller for legal opinions concerning two complex areas of law, accessory before the fact and joint venture, that he had not been shown to be qualified to give. See *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 (1975). Significantly, Miller was not asked if he

believed or felt he might be charged with the crimes for his activities that night.

"If, on the facts, there is a possibility of bias, even a remote one, the judge has no discretion to bar all inquiry into the subject." *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 400, cert. denied, 516 U.S. 861 (1995), citing *Commonwealth* v. *Aguiar*, 400 Mass. 508, 513 (1987). However, "[a] judge does have discretion to limit cross-examination concerning possible bias when further questioning would be redundant." *Commonwealth* v. *Tam Bui, supra.* It is apparent that the judge was not precluding "all inquiry" into the question of bias but had sustained the objections either because of the form of the questions or because they were cumulative of earlier, numerous questions put to Miller on the issue of bias. Trial counsel had been allowed to question Miller as to the fact that he did not want to be charged with murder; that he was not charged with a crime despite giving police different versions of events and having lied to them; that he had a motive to fabricate his version of events and to cooperate with police because he was on probation and parole and did not want to go back to jail; and that in exchange for his cooperation police would speak to his probation officer; and the implausibility of his assertion that he had not been promised anything concerning potential criminal charges that arose out of his activities on the night of the murder. The subject of bias was explored extensively, and the defendant's constitutional rights to cross-examine Miller were not violated. There was no error.

The defendant also contends that the prosecutor improperly vouched for Miller when registering his objection to the first question, by stating improperly in the presence of the jury: "Your Honor, first of all, it can't. Objection." We disagree. There was no improper vouching because the prosecutor did not "express[] a personal belief in the credibility of a witness, or indicate[] that he or she has knowledge independent of the evidence before the jury." *Commonwealth* v. *Ortega*, 441 Mass. 170, 181 (2004), quoting *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998). We also are satisfied that the brevity of the prosecutor's assertion ("it can't") could not have conveyed to the jury, in violation of Mass. R. Crim. P. 22, 378 Mass. 892 (1979) (objecting party "may state precise legal grounds . . .

but . . . shall not argue or further discuss such grounds unless" requested to do so by the court), the complexity of the law of accessory before the fact and joint venture, as the defendant argues. However, even if the objection were made improperly, the absence of any objection or request for a curative instruction by experienced defense counsel is some indication that the comment by the prosecutor could not have created a substantial likelihood of a miscarriage of justice. Cf. *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985) (using absence of objection or request for curative instruction to assess prejudicial impact of improper aspect of prosecutor's closing).

3. *Police vouching.* The defendant contends that a State police officer had improperly vouched for Miller's credibility, and thereby placed "the imprimatur of official belief in the [witness]," when he testified that after Miller had given three versions of events regarding the night of murder, he told Miller he would speak to Miller's probation officer if Miller cooperated in the investigation. The officer testified that thereafter, Miller appeared before the grand jury, after which police continued to investigate his version of events, "verify[ing them] . . . with forensics, telephone records, and there might have been other things that were done." The officer then spoke to Miller's probation officer and asked if she would help Miller by seeking to have his probation extended. The defendant argues that the clear import of the officer's "verification" of Miller's last version of events and his offer to help Miller with his probation matter was the officer's official belief that Miller was telling the truth. We disagree.

It is clear that the officer was not vouching for Miller, as he had not expressed his personal belief in Miller's credibility. See *Commonwealth* v. *Ortega*, *supra*. He was describing the steps taken in the investigation to corroborate through independent evidence Miller's account of what transpired that evening. This "verification" was essentially the fruits of that investigation — independent evidence, and not the officer's belief in Miller — which ultimately was laid out before the jury. This independent evidence included telephone records used to trace the movement of the Jeep through Boston and Cambridge, ballistics reports identifying the guns that were involved, and DNA reports

used to connect the nine millimeter handgun to Sherrod. Indeed, if this work had not been done, its absence could have been used to impeach the investigation itself. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980). What was meant by "verifying" Miller's statement was the accumulation of independent evidence from which a fact finder could corroborate Miller's statement. It was solid police work, not vouching. There was no error.

4. *Sequestration.* The defendant argues that the judge erred by declining to sequester two police officer witnesses who were involved in the investigation, and who had conducted interviews of Miller. The prosecutor agreed that the officers would remain outside the court room during opening statements. Only one of the officers from the State police testified.

The decision to sequester witnesses lies within the discretion of the trial judge. *Commonwealth* v. *Watkins*, 373 Mass. 849, 851 (1977), citing *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 748 (1975). "The chief purpose" of sequestration is to "prevent the commission of perjury." *Commonwealth* v. *Gogan*, 389 Mass. 255, 261 (1983), citing *Commonwealth* v. *Jackson*, 384 Mass. 572, 582 (1981). There is no error in excepting from a sequestration order a witness, typically a police officer, who is essential to the management of the case. See *Commonwealth* v. *Therrien*, 359 Mass. 500, 508 (1971), citing J. Wigmore, Evidence § 1841 (3d ed. 1940).[2] There has been no showing that the judge abused his discretion.

5. *Prosecutor's closing argument.* The defendant first contends that the prosecutor misstated the evidence in his closing argument, as outlined below. After reviewing the transcript and the exhibits, we conclude that the prosecutor's closing argument was based soundly in the evidence presented at trial, together with reasonable and possible inferences that could have been drawn from the evidence. *Commonwealth* v. *Dinkins*, 415 Mass. 715, 725 (1993).

---

[2]The Commonwealth asserts, and the defendant does not challenge, that the prosecutor requested the presence of the two officers for this reason. The officers had interviewed nearly all the civilian witnesses, and they were responsible for securing the presence at trial of those witnesses, many of whom were uncooperative or reluctant.

The prosecutor had asked the jury to conclude that the defend-
ant and Bright were not using their cellular telephones from the
time they left the Jeep, killed Corey, and returned to the Jeep.
For support, he recalled the testimony of a witness who had
seen two men who generally matched the descriptions of the
defendant and Bright near the murder scene. The witness said
she did not remember the men talking on cellular telephones
when she saw them. The prosecutor also pointed to evidence of
telephone records for the cellular telephones that the defendant
and Bright had been using that night. Those records indicated
that their telephones were not in use during and around the time
of the shooting. The evidence supports the inference the prosecu-
tor was asking the jury to draw. The jury reasonably could infer
that, when the witness said she did not remember seeing the
two men using cellular telephones, she meant that her best
memory was that they were not talking on cellular telephones
when she saw them. She was not saying that she had no memory
of the matter. Cellular telephone records for the telephones used
by the defendant and Bright that night confirmed such nonuse.

The prosecutor's argument that Miller could not have been
the killer was grounded in cellular telephones records and the
testimony of a Sprint/Nextel engineer, who testified that when
Miller was on his cellular telephone between 11:43 P.M. and
11:53 P.M. on March 18, 2006, he must have been in an area
several blocks away from the murder. The prosecutor's argument
that Miller could not have committed the murder, which occurred
at about 11:52 P.M., was firmly based on the evidence and fair
inferences that could be drawn therefrom. There was no error.

The defendant next contends that the prosecutor impermis-
sibly vouched for the credibility of the State police officer who
testified that he arranged to help Miller with his probation situ-
ation in exchange for his cooperation, but that he did not make
any promises to Miller about being charged with a crime, and
that he had no authority to make such a promise. Trial counsel
for the defendant had argued to the jury that Miller could not be
believed when he said he received "no deal" on the murder
case from the officer, and that the officer must have "winked at
him"; the prosecutor argued in response that the question whether
a deal existed did not rest only on Miller's testimony. He said

that the jury could look to the testimony of the State police officer, stating, "Does he appear to you to be the winking type?" The prosecutor then referred to the officer's testimony about his experience and his lack of authority to make assurances of no prosecution or reduced prosecution. The prosecutor argued to the jury that the officer should be believed because he was a twenty-six-year veteran of the State police, twenty-one of which were spent as a homicide detective, and that he had worked on more than one hundred homicide investigations. This was not improper vouching, as the prosecutor neither expressed his personal belief in the credibility of the officer nor indicated that he possessed knowledge independent of the evidence before the jury. See *Commonwealth* v. *Ortega*, 441 Mass. 170, 181 (2004). Rather, he placed the issue of the officer's credibility squarely in the domain of the jury.

The defendant's reliance on *Commonwealth* v. *McCoy*, 59 Mass. App. Ct. 284 (2003), is misplaced. In that case trial counsel had not implied that the police officer had lied. *Id.* at 294-295. The prosecutor in that case had made an emotional appeal to the jury about the need for crime-free streets — which implicitly called for faith and reliance on police witnesses — and the prosecutor had resorted to needless hyperbole. *Id.* at 295. By contrast, the defendant's trial counsel here argued that Miller was lying about not having received assurances and, by implication, so was the police officer. The prosecutor here made no emotional appeal, and he did not resort to hyperbole. He simply placed the officer's credentials before the jury. There was no error.

6. *Review under G. L. c. 278, § 33E.* We have reviewed the briefs and the entire record, and we discern no reason to reduce the degree of guilt or order a new trial.

*Judgments affirmed.*