NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12039


COMMONWEALTH  vs.  CESAR SANTANA.



Essex.     January 10, 2017. - August 17, 2017.

Present:  Gants, C.J., Lenk, Hines, & Gaziano, JJ.


Homicide.  Constitutional Law, Admissions and confessions,
    Voluntariness of statement.  Evidence, Admissions and
    confessions, Voluntariness of statement, Hearsay, Expert
    opinion.  Witness, Expert.  Practice, Criminal, Capital
    case, Motion to suppress, Admissions and confessions,
    Voluntariness of statement, Mistrial, Argument by
    prosecutor, Plea.




    Indictments found and returned in the Superior Court
Department on December 12, 2008.

    A pretrial motion to suppress evidence, filed on June 8,
2009, and amended October 3, 2011, was heard by Kimberly S.
Budd, J.; a second pretrial motion to suppress evidence, filed
on April 12, 2012, was heard by Howard J. Whitehead, J.; a third
pretrial motion to suppress evidence, filed on June 4, 2013, was
heard by Richard E. Welch, III, J.; and the cases were tried
before David A. Lowy, J.


    Elizabeth Caddick for the defendant.
    Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.

HINES, J.  In January, 2014, a Superior Court jury convicted the defendant, Cesar Santana, of murder in the first degree of Rafael Castro, on the theories of extreme atrocity or cruelty, and felony-murder with home invasion and armed burglary, assault on occupant as the predicate felonies.  On appeal, the defendant asserts error in (1) the denial of his motion to suppress statements; (2) the admission of hearsay testimony from various witnesses; (3) the denial of a requested DiGiambattista jury instruction; (4) the denial of the motion for a mistrial following the jury's exposure to inadmissible evidence; and (5) certain improper statements made in the prosecutor's closing argument.  The defendant also requests that we exercise our authority pursuant to G. L. c. 278, § 33E, to reduce the murder conviction or to order a new trial.  We affirm the defendant's convictions and decline to grant relief under G. L. c. 278, § 33E.

Background.  1.  The murder.  We summarize the facts the jury could have found, reserving certain details for our discussion of the alleged errors.  On the night of August 25, 2004, Norma Cedeno and her stepfather, Rafael Castro, were

attacked by a group of men as the two entered Castro's Lawrence apartment.[1]

Cedeno, who entered the apartment first and did not turn on any lights, walked to the bathroom, where she was grabbed by a man.  Although she could not see the man's face, she felt something "like a gun" on her back.  Hearing Cedeno scream, Castro ran into the apartment, and two men came out of the kitchen.  As the men struggled, Cedeno, who had been pushed down to the floor and told to keep her head down, heard a gunshot, saw Castro on the floor, and heard men arguing in Spanish, some of whom asked, "Why did you shoot him?"  Based on the voices she heard and the feet she could see walking around the apartment, Cedeno deduced that four men were involved in the incident.

Thereafter, Cedeno was taken into a bedroom and made to lie on the floor.  A pillowcase was put over her head.  Although the men were initially going to duct tape her hands and feet together, they complied with her plea not to tie her up. Instead, one man remained in the bedroom with her.  Cedeno could hear Castro's voice, which although clear at first, became fainter as time passed.  During the time the men were in the apartment, Cedeno heard them "screaming," hitting and threatening Castro, and demanding that he make a telephone call.

---

[1] Norma Cedeno testified to the details of the attack at trial under a grant of immunity concerning her involvement in drug dealing with her mother and stepfather.

At one point, the men brought Cedeno into the bedroom with Castro, removed her shirt, and threatened to burn her with an iron unless Castro agreed to make the call.

Eventually, one man said to Cedeno, "Three of us are leaving and I'm staying here . . . and after I leave[,] if you call the police or someone for help we're just going to come back for you." Although Cedeno did not know the men, they seemed to be familiar with Castro. After all of the men left the apartment, Cedeno went to the other bedroom and found Castro, taped up, bleeding from the gunshot wound on his head, and unable to talk. Cedeno cut the duct tape binding Castro and, eventually, telephoned 911.

Paramedics who arrived in response to the 911 call determined that Castro had "no obvious signs of life." Castro's cause of death was the gunshot wound to his head.

2. The investigation. The police recovered evidence from the apartment including two rolls of duct tape, one of which had blood on it, several pieces of duct tape, one piece of which was found in the bathroom trash barrel, and samples of bloodstains and pools in various areas of the apartment.

A latent fingerprint from a roll of duct tape recovered from the scene was determined to be consistent with the known fingerprint of Joonel Garcia. Also, a deoxyribonucleic acid (DNA) swab was taken from a "small indentation" near the torn

end of the piece of duct tape found in the bathroom trash barrel. It contained a mixture of the DNA of at least two individuals, including the defendant, whose DNA "matched" the major profile of the mixture.

The police interviewed Jessica Encarnacion, who was the girl friend of Garcia and lived with him in an apartment in Lawrence. At trial, Encarnacion testified that four men -- Garcia, the defendant, and two others -- arrived at around midnight at Garcia's apartment. Garcia was covered in blood. Ignoring Encarnacion's questions about what was going on, Garcia told her to pack because they had to leave the country. Thereafter, she and the four men drove to New York, stopping only to dispose of the gun. Once in New York, Garcia and Encarnacion purchased one-way tickets to the Dominican Republic and left the United States.

In August, 2004, the defendant initiated a conversation with his probation officer,[2] during which he stated that he would be willing to provide information about a shooting in Lawrence in exchange for financial compensation. The defendant told this officer that a man named "Joonie" shot someone in the head, and that the defendant knew the location of the firearm used in the shooting. The probation officer passed the information on to

---

[2] At the time, the defendant was on probation for an unrelated matter.

the Boston police department.[3]  In March, 2005, the defendant initiated a second conversation with his probation officer about the shooting in Lawrence.  This time he told the officer that he had significant legal concerns and added that the shooting in Lawrence was actually a drug-related "homicide."

On March 4, 2005, the police interviewed the defendant.  At that time, the defendant was being held in a house of correction on unrelated charges.  Present were Trooper Robert LaBarge of the State police and Detective Carlos Cueva of the Lawrence police department.  Although the defendant indicated that he spoke and understood English, LaBarge asked Cueva to serve as a Spanish translator because Spanish was the defendant's primary language.[4]  Initially, the defendant agreed to allow the police to audio record the interview.  His demeanor was "cautious," but he did not exhibit signs of emotional distress.  The tone of the interview was conversational.  During the recorded portion of the interview, the defendant was provided Miranda warnings in Spanish and the defendant read the warnings out loud in Spanish.  After the defendant acknowledged that he understood and signed

---

[3] The trial record lacks evidence of the Boston police department's response to the probation officer's first report.

[4] Detective Carlos Cueva spoke both English and Spanish, and considered Spanish to be his native language.  Although Cueva grew up speaking Spanish in his family home and studied Spanish in high school, he had no formal training in Spanish translation.

the written warnings, LaBarge began questioning the defendant about the murder of Castro.

During the interview, in response to the suggestion that he was inside the apartment at the time of Castro's murder, the defendant stated that he was actually outside the apartment, arriving only after the incident occurred.  The defendant told the police that after he received a call from Garcia requesting a ride, he drove to an apartment building, picked up Garcia and two other men, and dropped them off at Garcia's Lawrence apartment.  During the drive to the Lawrence apartment, the men discussed the fact that Garcia had shot Castro.  After remaining in Garcia's apartment for a period of time, the defendant drove Garcia and Encarnacion to Boston.  The firearm used in the murder was buried before Garcia and Encarnacion left for the Dominican Republic.  The day before the murder, the defendant had transported a bag of firearms to Garcia's Lawrence apartment.  In exchange, the defendant received money and drugs. At the conclusion of the interview, LaBarge asked the defendant to sign the contemporaneous handwritten notes transcribing the conversation, but the defendant refused.

Discussion.  1.  Motion to suppress.  The defendant filed three motions to suppress statements he made during the March 4, 2005, interview with the police.  Insofar as relevant here, in 2013, the defendant filed a third motion to suppress,

reasserting the voluntariness issue that had not been reached in any previous ruling. A judge (motion judge) denied this motion, ruling that "[a]ny understanding that [the] statements would be confidential and not used in court, was completely dissipated" after the defendant was given the Miranda warnings and voluntarily waived those rights. The defendant challenges only the motion judge's ruling denying the motion to suppress on the ground that his statement was voluntary.

We recite the facts as found by the motion judge who "fully [i]ndorsed and incorporate[d]" the facts found by a different judge who had denied one of the defendant's earlier motions to suppress. We supplement the facts "with evidence in the record that is uncontroverted and that was implicitly credited by the motion judge." Commonwealth v. Melo, 472 Mass. 278, 286 (2015).

The defendant met with the police at the jail where he was being held on unrelated charges. The officers were in plainclothes and did not have their credentials or firearms with them during the interview. The tone of the interview was conversational. Because the defendant did not always understand English, Cueva translated. However, the translation of LaBarge's statements was neither word for word nor always accurate. Cueva also communicated information in Spanish to the defendant without translating it into English for LaBarge. When LaBarge asked the defendant if he would consent to having the

interview recorded, Cueva did not translate the defendant's response: "Okay, no problem . . . okay . . . as long as it is not used in court . . . better if not used in court . . . whatever I say to you be confidential."  Instead, Cueva replied to the defendant, "No, do not worry," in Spanish.

After this colloquy between the defendant and Cueva and prior to asking any questions about the murder, LaBarge inquired whether the defendant could read and write Spanish.  When the defendant replied, "Yeah, perfect," LaBarge provided him with Miranda warnings written in Spanish.  LaBarge asked the defendant to read aloud each warning and say whether he understood it.  The defendant did so and indicated that he understood the warnings.

Following the Miranda warnings, LaBarge stated to the defendant, "We are going to use the information . . . I have to be honest, my goal is not to, to save you and to help you out. My goal is to find the truth."  Cueva translated this statement as follows:  "Any information that you give us now, [LaBarge would] go to the court and they'd talk with the judge and the lawyer and to say that 'look, Cesar came, talked to me, gave me that and, we're going to try to help you, but he wouldn't give you er . . . er, you know."  Near the end of the recorded portion of the interrogation, the defendant said in Spanish,

"Tell him that it was me who had him come over, it wasn't him who looked for me -- it was me who asked for him to come over."

Relying on the transcript of the recorded portion of the interview, the motion judge also found that the tone of the interview was "conversational," the defendant was "relaxed throughout," and "appeared to be chuckling or laughing" on occasion. Regarding the defendant's language skills, the judge found that the defendant "plainly can speak and understand a fair amount of English," although Spanish is "obviously" his "primary language." The judge further found that "the defendant plainly understood each [Miranda] right," provided to him in Spanish, and "at times [he] corrected LaBarge as to the numbering of these rights." Last, the judge determined that although "Cueva's translation, obviously, could have been much better," the defendant nevertheless "fully understood what was going on."

a. Standard of review. In this case where the motion judge's findings were based in part on his review of the transcript of the defendant's interview with the police and in part on a different judge's findings after an evidentiary hearing, we apply the appropriate standard of review to each in our review of the denial of the defendant's motion to suppress. To the extent that the motion judge's findings are based on the documentary evidence available to this court in the appellate

record, our review is de novo. We give no deference to those findings as "this court stands in the same position as . . . the [motion] judge, and reaches its own conclusion unaffected by the findings made by the [motion] judge." Commonwealth v. Novo, 442 Mass. 262, 266 (2004), quoting Berry v. Kyes, 304 Mass. 56, 57 (1939). Insofar as the motion judge's findings incorporate the other judge's findings, "we accept [those] findings of fact and will not disturb them absent clear error. " Commonwealth v. Tremblay, 460 Mass. 199, 205 (2011). However, "[w]e make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found." Id.

b. Analysis. In deciding the issue of voluntariness, the motion judge acknowledged that the defendant's initial statement that he would speak to the officers "as long as it was not used in court" was "concerning," and Cueva's response, "No, don't worry," was "even more concerning." Nonetheless, the motion judge concluded that, "[a]ny understanding that his statements would be confidential and not used in court, was completely dissipated after Trooper LaBarge requested that the defendant read his Miranda rights and when the defendant voluntarily waived those rights." Additionally, the motion judge concluded that LaBarge further dispelled the notion that the defendant's statements would not be used against him when he "went out of

his way to explain to the defendant, who obviously understood some English, that he was not making any promises to the defendant," and that he would report the defendant's statements to the prosecutor and or the court. On this basis, the motion judge concluded that the defendant's statement was voluntary and a product of the defendant's "free will." There was no error.

"It is well established that a confession or an admission is admissible in evidence only if it is made voluntarily." Tremblay, 460 Mass. at 206. A statement is voluntary when it is "the product of a 'rational intellect' and a 'free will,' and not induced by psychological coercion." Commonwealth v. Monroe, 472 Mass. 461, 468 (2015), quoting Tremblay, supra at 207. The burden is on the Commonwealth to "prove beyond a reasonable doubt that 'in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was [not] overborne,' but rather that the statement was 'the result of a free and voluntary act.'" Commonwealth v. Baye, 462 Mass. 246, 256 (2012), quoting Commonwealth v. Durand, 457 Mass. 574, 595-596 (2010), S.C., 475 Mass. 657 (2016).

Because "the issue of voluntariness turns on 'all the surrounding circumstances,'" Baye, 462 Mass. at 256, quoting Dickerson v. United States, 530 U.S. 428, 434 (2000), we have declined to adopt a "'bright-line rule[]' that the use of improper interrogation techniques [such as promises of

confidentiality] will always result in suppression of a defendant's incriminating statements as involuntary." Baye, supra, quoting Tremblay, 460 Mass. at 210-211. However, we have warned, "assurances that a suspect's statements will not be used to prosecute him will often be sufficiently coercive to render the suspect's subsequent admissions involuntary even when the suspect shows no outward signs of fear, distress[,] or mental incapacity" (quotations omitted). Baye, supra at 262. We conclude, as did the motion judge, that the assurance of confidentiality in the particular circumstances of this case was dissipated by the timing of the Miranda warnings and other factors tending to show that the defendant did not rely on that assurance in making his statement to the police.

Here, the Miranda warnings were given orally and in writing after Cueva's response, "No, don't worry," to the defendant's expressed concern that his statement not be used against him in court. The motion judge found that the defendant understood the warnings because they were written in Spanish, the defendant's native language. To ensure that the defendant understood the warnings, LaBarge required him to read each warning out loud, and verbally indicate whether he understood after each. The defendant did so as to each, and signed the Miranda waiver form. Further, the defendant's familiarity with the warnings and his correction of the officer's recitation of the warning supports

this finding.[5]  There is no suggestion in this record that the defendant did not understand the warnings, which plainly informed the defendant that his statements could not be held confidential.  LaBarge's caution that the defendant's statement would be conveyed to the prosecutor and the court sufficiently dispelled any assurance that the defendant's statements would not be used against him.  Thus, the plain language of the Miranda warnings, which the defendant understood, communicated that the statements could not be held confidential.

We recognize, however, that the recitation of Miranda warnings is not dispositive.  See Commonwealth v. Libby, 472 Mass. 37, 41 (2015) ("Whether made in a custodial or noncustodial setting, and even where there has been a valid waiver of Miranda rights, we must consider the voluntariness of a defendant's statement").  Rather, it is only one of several factors we consider when reviewing the voluntariness of a statement.  See Monroe, 472 Mass. at 468.  Apart from the language of the Miranda warnings disavowing any promise of confidentiality, we are persuaded by the judge's findings that the defendant could not have believed that his statement would

---

[5] The third warning (translated into English) read, "Anything that you say can be employed against you."  After reading the warning out loud in Spanish, Trooper Robert LaBarge asked him if he understood "number two," to which defendant responded "Yes," clarified, "That's number three," and indicated he also understood number two.

be confidential and that the defendant did not rely on that promise of confidentiality in making his statement.

After Cueva's, "No, do not worry," statement to the defendant and after the Miranda warnings, the police communicated in unambiguous terms that the statement would not be confidential and the precise manner in which the statement would be used.  Although Cueva's translation of LaBarge's statements was far from perfect, he nevertheless communicated to the defendant that the police were making no promise to keep the defendant's statement confidential.  In fact, Cueva told the defendant that they would report the information to "the [prosecuting] attorney that is going to be against [him] when [he] goes to court."[6]  Cueva also explained to the defendant that LaBarge was not there to promise that if he made a statement, the police would let him go or that his case would "come out well without problems."

Further, Cueva's statement to the defendant that the officers would speak of his cooperation with the court and try to help him does not undermine our conclusion.  We have

---

[6] Although we conclude that the defendant's statement was voluntary, we stress that Cueva's inaccurate translation, particularly his failure to translate for LaBarge the defendant's request for confidentiality and Cueva's response to the request, brought this case close to the line that otherwise would require suppression.  This case makes plain the need for law enforcement to use capable, trained translators who will report verbatim the question asked and the response given.

recognized that an officer is not prohibited from "suggest[ing] broadly that it would be 'better' for a suspect to tell the truth, [and] may indicate that the person's cooperation would be brought to the attention of public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past." Tremblay, 460 Mass. at 209, quoting Commonwealth v. Meehan, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980). See Commonwealth v. Tolan, 453 Mass. 634, 643 (2009) (officer's statement indicating police would help defendant and that defendant could help herself by telling truth did not constitute assurance forbidden by Meehan, supra); Commonwealth v. Mandile, 397 Mass. 410, 414 (1986) (statement not involuntary where defendant initiated discussion of leniency and affirmatively sought deal, and where officer indicated only that prosecutor would "discuss leniency").

Moreover, as the Commonwealth points out, the defendant's request to cease audio recording shortly after being provided his Miranda rights and his refusal to sign Trooper LaBarge's contemporaneous transcription at the conclusion of the interview because he "didn't know where he stood in the case," suggest that the defendant understood the statement could be used against him. Thus, this case is distinguishable from Baye, 462 Mass. at 257, where the officers "employed multiple problematic

tactics" throughout the ten-hour interrogation, including exaggerating the strength of the evidence and dissuading the defendant from speaking with an attorney by "clearly implying" that his statements would not be used against him.

Last, the defendant was motivated by self-interest and the fear of repercussions from Garcia when he approached his probation officer offering to provide information about the murder.  As the judge found, the defendant was not concerned about providing information to the police, he was particularly concerned with retaliation from "that young [nineteen year old] guy, that little guy has about [four] deaths under his belt." The defendant added, "that young guy has me, he has me, you know, he has me under a lot of pressure and terrified."

Accordingly, in light of the totality of the circumstances, we conclude that the Commonwealth met its burden of proving beyond a reasonable doubt that the defendant's statement was made voluntarily.  Therefore, any initial promise of confidentiality that Cueva conveyed to the defendant did not render his statement involuntary.

2. Evidentiary rulings. a. Bite mark testimony.  The defendant argues LaBarge's testimony that the duct tape found in the bathroom trash barrel of Castro's apartment "had . . . what was believed to be a bite mark or dental impression, where it looked like -- I was told maybe somebody had bit it, when they

were ripping it" constituted inadmissible hearsay and violated his right to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  The testimony was admitted in the direct examination of LaBarge regarding forensic evidence that the police processed during the investigation in an effort to identify possible suspects.  LaBarge's response constituted impermissible hearsay and should not have been admitted.

Because there was no objection at trial, our inquiry is "'whether the impropriety created a substantial likelihood of a miscarriage of justice.'"[7]  Commonwealth v. Fritz, 472 Mass. 341, 351 (2015), quoting Commonwealth v. Gentile, 437 Mass. 569, 579-580 (2002).  We conclude that it did not.  The defendant's

---

[7] Prior to trial, the defendant filed a motion in limine that sought to exclude evidence of the "tooth mark."  This motion, however, does not properly preserve the defendant's claim of error with respect to LaBarge's inadmissible hearsay testimony.  In Commonwealth v. Grady, 474 Mass. 715, 719 (2016), we concluded that we would no longer require an objection to the admission of evidence at trial where the defendant sought to preclude the admission of the evidence through a motion in limine.  However, we cautioned that our ruling "is not as broad as it may seem."  Id.  Specifically, "[a]n objection at the motion in limine stage will preserve a defendant's appellate rights only if what is objectionable at trial was specifically the subject of the motion in limine."  Id.  In his motion in limine, the defendant objected to the admission of the "tooth mark" evidence because "the Commonwealth does not intend to call any expert with sufficient education, training, or familiarity with the subject matter of the anticipated testimony."  Because LaBarge's hearsay testimony was not the subject of the motion in limine and the defendant failed to object at trial, the error was not properly preserved.

defense was that he was not in the apartment at the time of Castro's murder, and that his DNA was possibly inadvertently left on an indentation near the ripped edge of an approximately twelve-inch piece of duct tape when he brought the bag of guns to Garcia's Lawrence apartment.  This explanation strains credulity, as it required the jury to believe one of two scenarios:  (1) that a piece of duct tape with the defendant's DNA near the ripped edge was transported in a bag along with the guns to Garcia's apartment and then placed in the bathroom trash barrel of Castro's apartment; or (2) that the defendant's DNA was inadvertently transferred to the roll of duct tape and remained on the tape after it was handled, ripped, and placed in the bathroom trash barrel by someone else.  Accordingly, we conclude that no substantial likelihood of a miscarriage of justice resulted from the impermissible hearsay testimony.

b.  Testimony regarding the defendant's presence at the scene.  The defendant argues that the trial judge erred when he permitted LaBarge to testify that he told the defendant that he had information that the defendant was in the apartment at the time of the crime because it constituted inadmissible hearsay and violated his confrontation rights.[8]  The defendant's argument is unavailing.

_____

[8] Specifically, the following colloquy between the prosecutor and Trooper LaBarge was admitted at trial:

It is well established that "if a defendant is charged with a crime and unequivocally denies it, that denial is not admissible in evidence." Commonwealth v. Bonnett, 472 Mass. 827, 838 (2015), quoting Commonwealth v. Morse, 468 Mass. 360, 375 n.20 (2014). But, we have also recognized that "accusatory statements shed their hearsay character when they are offered not for the truth of the matter asserted, but to provide context for admissible statements of the defendant." Bonnett, supra at 838 n.13. Such was the case here.

As the trial judge pointed out, the accusation was not offered for its truth, but rather to contextualize the defendant's statement that is "arguably exculpatory." Absent the prefatory statement to contextualize the defendant's response (that he was outside the apartment that night), it improperly suggests that the defendant, without any prompting, generously put himself at the scene of the murder. Because the statements were not introduced for the truth of the matter asserted, their admission did not violate the defendant's right

---

The prosecutor: "Trooper, did you . . . tell Mr. Santana that you believe that he was inside the apartment that night, and that you had information that he was there that night?"

The witness: "Yes."

The prosecutor: "What was his response to that?"

The witness: "He denied being in the apartment."

to confrontation under the Sixth Amendment.  See Crawford v.
Washington, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation]
Clause . . . does not bar the use of testimonial statements for
purposes other than establishing the truth of the matter
asserted").

To ensure that the jury did not use the statements for an
improper purpose, the judge instructed the jury that LaBarge's
statement was not admissible for its truth, or for any
information that the trooper did or did not have.  See Bonnett,
472 Mass. at 838 n.13 (it may be appropriate for defendant to
request instruction "limiting the jury's consideration of the .
. . [accusatory] statements to its nonhearsay purpose").
Additionally, the judge emphasized that the jury were to use the
statement only for the purpose of understanding, weighing, and
considering the answer that the defendant gave in response to
the trooper's question.  Accordingly we conclude that the judge
committed no error in admitting LaBarge's statement.

c.  Substitute medical examiner testimony.  The defendant
maintains that the judge erred in allowing the admission of the
testimony of a substitute medical examiner, who did not conduct
the autopsy of Castro and who based her testimony, in part, on

the drawings of the nontestifying medical examiner.[9] The defendant filed a motion in limine seeking exclusion of the testimony, and also objected at trial. The defendant argues that the admission of the testimony violated his confrontation rights under the Sixth Amendment and under art. 12. We disagree.

In Commonwealth v. Reavis, 465 Mass. 875 (2013), we outlined the parameters of the opinion testimony that a substitute medical examiner may offer at trial. Specifically, we instructed that "[a] substitute medical examiner who did not perform the autopsy may offer an opinion on the cause of death, based on his review of an autopsy report by the medical examiner who performed the autopsy and his review of the autopsy photographs." Id. at 883. We allow the substitute medical examiner to opine on this issue because autopsy reports by other medical examiners and autopsy photographs "are documents upon which experts are accustomed to rely, and which are potentially independently admissible through appropriate witnesses." Id.

Here, the substitute medical examiner's testimony remained largely within the parameters we set forth in Reavis. The medical examiner opined on Castro's cause of death (gunshot wound), how the gunshot likely led to his death, and the amount

---

[9] The medical examiner who conducted the autopsy of Castro in August, 2004, was no longer employed by the office of the chief medical examiner at the time of trial.

of time that could have elapsed between the gunshot wound and his death, all of which were permissible areas of inquiry under Reavis. See Reavis, 465 Mass. at 883. To the extent that the substitute medical examiner's opinion ventured into inadmissible territory -- specifically, the location of the gunshot wound -- it was limited when the judge sua sponte paused the direct examination of the witness, held a colloquy between the parties at sidebar, and struck the improper testimony from the record.

Nevertheless, the defendant contends that he could not meaningfully cross-examine the substitute medical examiner about the reliability of the drawings produced by the medical examiner responsible for performing Castro's autopsy; thus, the admission of the testimony was inconsistent with Commonwealth v. Greineder, 464 Mass. 580, 595, cert. denied, 134 S. Ct. 166 (2013). We are not persuaded. In Greineder, we reiterated that where the pathologist responsible for performing the autopsy was unavailable to testify at trial, the substitute expert witness was prohibited from testifying to the pathologist's autopsy findings. Id. at 585. However, consistent with previous cases, we reaffirmed that independent expert opinion testimony, even where based on facts and data originating from a nontestifying examiner's report, does not infringe on a defendant's right of confrontation because the defendant has the opportunity to cross-examine the witness on "the foundation of [her] opinion."

Id. at 584-589.  Here, the substitute medical examiner testified to her independent opinion and was available for cross-examination on the foundation of that opinion.  Thus, the testimony was consistent with this court's mandates in Reavis and Greineder, and its admission was not error.

3.  DiGiambattista instruction.  At trial, the defendant asked the judge to instruct the jury pursuant to Commonwealth v. DiGiambattista, 442 Mass. 423 (2004).  The judge denied the request, reasoning that because defendant requested the audio recording device to be turned off, he was not entitled to the instruction.  The defendant argues that the trial judge erred in declining to give a DiGiambattista instruction where a portion of the defendant's interview with the police was not audio recorded.  We agree.

In DiGiambattista, 442 Mass. at 447, we held, "when the prosecution introduces evidence of a defendant's confession or statement that is the product of a custodial interrogation or an interrogation conducted at a place of detention . . . , and there is not at least an audiotape recording of the complete interrogation, the defendant is entitled (on request) to a jury instruction."  We further determined that "the instruction is appropriate for any custodial interrogation, or interrogation conducted in a place of detention, without regard to the alleged reasons for not recording that interrogation."  Id. at 448.

Although it would have been permissible for the prosecution to raise as a justification for the incomplete recording the defendant's affirmative request to cease recording, it "[did] not obviate the need for a cautionary instruction." Id. at 449. See Commonwealth v. Woods, 466 Mass. 707, 721 n.15, cert. denied, 134 S. Ct. 2655 (2014) (defendant entitled to DiGiambattista instruction "even where . . . the defendant affirmatively requests that that the interview not be recorded"). Thus, it was error for the judge to deny the defendant's request for a DiGiambattista instruction.

Because the error was preserved, we must determine "whether 'the error did not influence the jury, or had but very slight effect,'" and thus was nonprejudicial. Commonwealth v. Christian, 430 Mass. 552, 563 (2000), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). Applying this standard, we conclude that the error was nonprejudicial. We have noted that "the value of [a DiGiambattista] instruction is lessened where . . . the defendant's statements, dubious as they may be, were largely exculpatory." Woods, 466 Mass. at 721. Here, the defendant's statement was at least partially exculpatory, as the defendant claimed that he was not at the apartment at the time of the murder, and only went to the apartment because Garcia called him for a ride. In fact, the defendant's defense strategy was, at least in part, dependent on the jury believing

his statement.[10]  Therefore, we conclude that the denial of the

DiGiambattista instruction constituted nonprejudicial error, and

thus does not warrant reversal.

4.  Motions for a mistrial.  The defendant contends that

the denial of his motions for a mistrial constituted error where

the jury were repeatedly exposed to inadmissible evidence.

Prior to trial, the defendant filed a motion in limine seeking

to prevent reference to his prosecution in a later Superior

Court case in Suffolk County involving some of the same

individuals involved in Castro's killing.  The trial judge did

not explicitly rule on the motion after the prosecutor indicated

that she was not seeking to introduce the evidence.  At trial,

when asked about another trooper's role in the investigation of

Castro's murder, Trooper LaBarge explained that he asked the

other trooper to compare the latent print found from the roll of

duct tape in Castro's apartment against "four individuals that

were arrested in the city of Boston."  Defense counsel

immediately objected, requested to go to sidebar, and moved for

a mistrial, arguing that the testimony, at least by inference,

implicated the defendant.  After a colloquy outside the presence

of the jury, the judge denied the motion, but indicated he would

_____

[10] A major theme of defense counsel's closing was the fact that the defendant, unlike the other people involved, cooperated with the police and gave a statement because the defendant did not commit the crime, and had no idea that the guns he previously delivered to Garcia would be used in the robbery.

strike the testimony from the record and give a curative instruction.

Following the sidebar, the judge instructed the jury that the trooper's testimony regarding four individuals being arrested in the city of Boston was not evidence in the case as it was struck from the record, and not for the jury to consider "in any regard to this case."  The judge further instructed:

> "When an answer is stricken from the record, it doesn't exist.  When you determine what the facts are from the case, you are sworn to determine those facts solely and exclusively from the evidence presented in the case, and you may never consider evidence anything that's been stricken from the record."

Despite the judge's instruction, on the resumption of LaBarge's direct testimony, in response to the prosecutor's question regarding the fingerprints he asked the other trooper to compare, LaBarge responded, "The four individuals I previously spoke of."  Again, defense requested a sidebar, and renewed his motion for a mistrial.  The judge again denied the motion, struck the testimony, and gave a curative instruction.  In his instruction, the judge not only reminded the jury of his previous instruction, he also reiterated that when an answer has been struck, "it doesn't exist in the evidence, and you may not consider it in anyway."

The defendant argues that LaBarge's testimony constituted "prejudicial subsequent bad acts evidence" that carried the risk

of "distracting the jury from the main issue."  The denial of a motion for mistrial is reviewed for abuse of discretion. Commonwealth v. Gallagher, 408 Mass. 510, 517 (1990).  Given the trial judge's "broad discretion in deciding whether to declare a mistrial," we have instructed that "'this court should defer to that judge's determination of whether [there was] prejudicial error, how much any such error infected the trial, and whether it was possible to correct that error through instruction to the jury.'"  Commonwealth v. Amran, 471 Mass. 354, 359 (2015), quoting Commonwealth v. Thomas, 429 Mass. 146, 157 (1999).  This is because "[a] trial judge is in the best position to determine whether a mistrial, an extreme measure available to a trial judge to address error, is necessary, or whether a less dramatic measure, such as a curative instruction, is adequate."  Amran, supra at 360.

Here, Trooper LaBarge's two references to "four individuals that were arrested in the city of Boston" were improper. Although the trial judge noted during the colloquy outside the presence of the jury that the trooper's comment was "entirely inappropriate," he also pointed out that the jury did not actually learn that the defendant was arrested for home invasion in Suffolk County.  Nor were the jury ever made aware that the defendant was prosecuted and served time in prison for the home invasion.  Thus, the judge ultimately determined that the error

could be cured by striking both responses and giving a "strong cautionary instruction." See id. ("Where the judge promptly struck the improper testimony and gave a highly specific curative instruction, the judge acted appropriately and within her discretion"). The curative instruction made clear that the trooper's response was not evidence, and thus not to be considered. Moreover, as the Commonwealth points out, the trial judge previously had instructed the jury that the defendant "is on trial for the indictments before the court, and those indictments only." It is well settled that "[t]he jury are presumed to follow the judge's instruction" to disregard the evidence, id., and the record in this case does not suggest otherwise. Accordingly, we conclude that the judge did not abuse his discretion in denying the motions for mistrial.

5. The prosecutor's closing argument. The defendant argues that certain remarks by the prosecutor during her closing argument were prejudicial. "Remarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." Commonwealth v. Whitman, 453 Mass. 331, 343 (2009).

a. Witness's "enhanced" hearing. The defendant first contends that it was error for the prosecutor to argue that Cedeno's hearing was enhanced because she was blindfolded. According to the defendant, there were neither facts in evidence

nor expert testimony to support such a claim.  Because the defendant did not object to this statement at trial, we must determine whether the statement was improper, and "if so whether [it] created a substantial likelihood of a miscarriage of justice."  Commonwealth v. Fritz, 472 Mass. at 351, quoting Commonwealth v. Gentile, 437 Mass. at 579-580.

"A prosecutor must limit comment in [the] closing statement to the evidence and fair inferences that can be drawn from the evidence" (citation omitted).  Commonwealth v. Carriere, 470 Mass. 1, 22 (2014).  Although "a prosecutor may argue zealously in support of inferences favorable to the Commonwealth's case," the requirement that the inferences "reasonably may be drawn from the evidence" remains.  Id.  Such was not the case here. The record is devoid of evidence, much less expert evidence, suggesting that Cedeno had enhanced hearing due to her temporary blindfolding.

Although impermissible, we conclude that no substantial likelihood of a miscarriage of justice arose from the prosecutor's statement.  We have observed, "[i]n [certain] circumstances, [an] isolated remark does not warrant a new trial.  'Excusable hyperbole is not a ground for reversal, and the jury are presumed to have a certain measure of sophistication in sorting out excessive claims on both sides.'" Commonwealth v. Sylvia, 456 Mass. 182, 195 (2010), quoting

Commonwealth v. Ruiz, 442 Mass. 826, 835 (2004).  Moreover, as the Commonwealth points out, the prosecutor's enhanced hearing statement was cumulative of other evidence suggesting that there were four assailants present in the apartment with Cedeno and Castro, including Cedeno's testimony that she knew four people were present because she saw "feet walking around the apartment."  Last, when raising his objections to the prosecutor's closing argument, defense counsel neither objected nor requested a curative instruction on this ground.  See Commonwealth v. Ahart, 464 Mass. 437, 442 (2013) ("the absence of any objection or request for a curative instruction by experienced defense counsel is some indication that the comment by the prosecutor could not have created a substantial likelihood of miscarriage of justice").

b.  Bite mark on the duct tape.  The defendant next contends that the prosecutor improperly argued that the indentation in the duct tape found in the bathroom trash bin was a bite mark.  The Commonwealth argues that, based on the evidence presented at trial, the jury reasonably could have inferred that the indentation on the duct tape found in Castro's bathroom was a tooth mark produced by someone who tore the tape. We agree.  Three pieces of evidence presented at trial support our conclusion:  (1) the end of the duct tape was torn, (2) the presence of DNA was detected on the duct tape, and (3) saliva is

among the human biological fluids that provides a source of DNA. Therefore, we conclude that no prejudicial error arose from the prosecutor's statement.

c. <u>Characterization of DNA testimony</u>.  The defendant last argues that the prosecutor improperly equated the DNA statistics of a 99.999 per cent match with the proof beyond a reasonable doubt standard.  We disagree.  As pointed out by the trial judge, a close reading of the record reveals that the Commonwealth's remarks regarding the DNA statistics did not equate reasonable doubt to a percentage.  Rather, the prosecutor's remarks focused on the certainty, described in terms of percentages, of the defendant's DNA matching the major profile in the DNA mixture on the piece of duct tape found in the bathroom trash bin.  Accordingly, the prosecutor's remarks did not constitute error.

Even if the remarks were error, they did not create a substantial likelihood of a miscarriage of justice.  Here again, that fact that defense counsel neither objected nor sought a curative instruction provides some indication that the remarks did not create a substantial risk of a miscarriage of justice. See <u>Ahart</u>, 464 Mass. at 442.  Indeed, in raising his objections to the prosecutor's closing argument, defense counsel stated that because of the way the prosecutor characterized the DNA statistics, he did not believe it mischaracterized the

reasonable doubt standard, and thus did not object.
Additionally, the trial judge twice instructed the jury --
before and after closing arguments -- on the purpose of closing
arguments, noting they are an opportunity for the attorneys to
be zealous advocates for their respective clients, and
cautioning that the judge, not the attorneys, instruct on the
law that applies to the case.  As we have observed, in cases
where "close questions arise whether the prosecutor has gone
over the line between fair and improper argument," we recognize
that "closing argument is identified as argument, the jury
understands that, instructions from the judge inform the jury
that closing argument is not evidence, and instructions may
mitigate any prejudice in the final argument."  Commonwealth v.
Kozec, 399 Mass. 514, 517 (1987).

6.  Relief pursuant to G. L. c. 278, § 33E.  We have
conducted a complete review of the record pursuant to G. L.
c. 278, § 33E, and we discern no basis to grant relief.  The
defendant argues that we should exercise our powers under § 33E
to reduce his murder in the first degree conviction to a
conviction of manslaughter or murder in the second degree.  In
support of this request, the defendant points out that during
trial, the Commonwealth, for the second time, offered him a plea
to the lesser included offenses of manslaughter with a term of
imprisonment of from fifteen years to fifteen years and one day,

which the defendant declined.  That the Commonwealth offered the defendant a plea arrangement does not provide grounds on which to grant relief pursuant to § 33E and "is irrelevant to our inquiry."  <u>Commonwealth</u> v. <u>Cintron</u>, 435 Mass. 509, 525 (2001), overruled on another ground by <u>Commonwealth</u> v. <u>Hart</u>, 455 Mass. 230, 242 (2009).  Thus, the defendant's argument is unavailing, and we decline to exercise our power pursuant to § 33E on this ground.

<u>Judgments affirmed</u>.